FILED
MAR 10 2026

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF OHIO**

**WESTERN DIVISION**

MARINA DRUS, )

Plaintiff, )

) Case No 1:26CV255

v. ) Judge DLOTT

) Magistrate Judge M.L. LITKOVITZ

)

LAWRENCE COUNTY, OHIO; JEFF LAWLESS, )

individually; KODI PIZELLI, individually; )

CHRIS FRAME, individually; MICHAEL GORE, )

individually; DAVID LAMBERT; )

CINDY KAYE EADS (formerly known as )

Cindy Isgett); MILTON DEPRIEST; )

MICHAEL LONG; and DOES 1–10, )

)

Defendants. )

# COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Marina Drus, proceeding pro se, brings this civil rights action for damages pursuant to 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, and applicable federal and state law, and alleges as follows:

## I. PARTIES

1. Plaintiff Marina Drus is an adult resident of Boyd County, Kentucky, and a citizen of the United States.

2. Defendant Lawrence County, Ohio, is a political subdivision of the State of Ohio and is a "person" amenable to suit under 42 U.S.C. § 1983.

3. Defendant Jeff Lawless was, at all times relevant herein, the Sheriff of Lawrence County, Ohio. He is sued in his individual capacity.

4. Defendant Kodi Pizelli was, at all times relevant herein, a law enforcement officer employed as a Corporal by the Lawrence County Sheriff's Office. He is sued in his individual capacity.

5. Defendant Chris Frame was, at all times relevant herein, a law enforcement officer employed as a Deputy by the Lawrence County Sheriff's Office. He is sued in his individual capacity.

6. Defendant Michael Gore was, at all times relevant herein, the Chief Deputy of the Lawrence County Sheriff's Office. He is sued in his individual capacity.

7. Defendant David Lambert is a private individual who, at all times relevant herein, resided and operated a business in Lawrence County, Ohio. He is sued in his individual capacity. Plaintiff alleges that Lambert acted under color of state law through his willful participation in joint activity with state officials — including through coordinated use of prosecutorial and judicial authority — as set forth herein.

8. Defendant Cindy Kaye Eads (formerly known as Cindy Isgett, and also known as Cindy McKnight) is a private individual who, at all times relevant herein, resided at a property on Township Road 208 in Lawrence County, Ohio. She is referred to throughout this Complaint as "Isgett," which was her name at the time of the events alleged herein. She is sued in her individual capacity. Plaintiff alleges that Isgett acted under color of state law through her willful participation in joint activity with state officials, as set forth herein.

9. Defendant Milton Depriest is a private individual who, at all times relevant herein, resided in the vicinity of Township Road 208 in Lawrence County, Ohio. He is sued in his

individual capacity. Plaintiff alleges that Depriest acted under color of state law through his willful participation in joint activity with state officials, as set forth herein.

10. Defendant Michael Long is a private individual who, at all times relevant herein, resided on Township Road 208 in Lawrence County, Ohio. He is sued in his individual capacity. Plaintiff alleges that Long acted under color of state law through his willful participation in joint activity with state officials, as set forth herein.

11. Defendants Does 1 through 10 are individuals whose identities are not yet known to Plaintiff but who participated in one or more of the acts and omissions described herein. Plaintiff will seek leave to amend this Complaint to identify these individuals once their identities are ascertained through discovery.

**I-A. RELEVANT NON-PARTIES**

The following individuals are referenced in the factual allegations of this Complaint but are not named as defendants. They are identified here solely for purposes of clarity.

12. Tracie Crockrel is a private individual who, at all times relevant herein, resided on Township Road 208 in Lawrence County, Ohio. Plaintiff is not pursuing claims against Crockrel at this time and instead is limiting this action to the parties Plaintiff believes were principally responsible for the violations and resulting harm. Crockrel is referenced in the factual allegations as a witness and participant in the events described herein.

13. Bobby Corbin is a private individual who, at all times relevant herein, resided on Township Road 208 in Lawrence County, Ohio. Plaintiff is not pursuing claims against Corbin at this time and instead is limiting this action to the parties Plaintiff believes were principally responsible for the violations and resulting harm. Corbin is referenced in the factual allegations as a participant in the events described herein.

14. S.L. is a minor whose full name is withheld. S.L. resided on Township Road 208 in Lawrence County, Ohio at all times relevant herein. S.L. is not named as a defendant. S.L. is referenced in the factual allegations solely by initials.

15. Philip J. Heald was, at all times relevant herein, an Assistant Prosecutor of the Lawrence County Prosecutor's Office. He is not named as a defendant. Prosecutors are entitled to absolute immunity for actions taken in their prosecutorial capacity. Heald is referenced in the factual allegations in connection with the prosecution of Plaintiff.

16. Randall Lambert was, at all times relevant herein, an Assistant Prosecutor with the Lawrence County Prosecutor's Office who was listed on the criminal complaint in Plaintiff's prosecution. He is not named as a defendant due to absolute prosecutorial immunity. He is referenced in the factual allegations in connection with the prosecution of Plaintiff and his relationship with David Lambert

17. Magistrate Donald L. McWhorter was, at all times relevant herein, a Magistrate of the Lawrence County Court of Common Pleas. He is not named as a defendant because he is protected by absolute judicial immunity. Magistrate McWhorter is referenced in the factual allegations in connection with the protection order proceedings described herein.

18. Deputy DeLawder was, at all times relevant herein, a deputy employed by the Lawrence County Sheriff's Office. He is not named as a defendant at this time. Deputy DeLawder is referenced in the factual allegations in connection with representations made to Plaintiff regarding the transmission of her felony report.

## II. JURISDICTION AND VENUE

19. This action is brought pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution to redress the deprivation of Plaintiff's civil rights under color of state law.

20. This Court has original subject-matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) (civil rights).

21. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as the federal claims.

22. Venue is proper in the Southern District of Ohio, Western Division, under 28 U.S.C. § 1391(b)(2) because the events, acts, and omissions giving rise to Plaintiff's claims occurred in Lawrence County, Ohio, which is located within this judicial district.

## III. FACTUAL ALLEGATIONS

### A. Plaintiff's Background and Community Context

23. Plaintiff is a United States citizen residing in Boyd County, Kentucky.

24. Plaintiff previously resided in Lawrence County, Ohio, where she owned a rural farm property consisting of approximately thirty-one (31) acres located on Township Road 208, Ironton, Ohio.

25. Plaintiff is a first-generation immigrant who speaks with a foreign accent, which was openly referenced by neighbors and local actors in Lawrence County.

26. Plaintiff's disputes began after she moved to Lawrence County, and she experienced repeated confrontations and harassing conduct from multiple neighbors.

27. Neighbors and local officials repeatedly referred to Plaintiff as an "outsider" and referenced Plaintiff's accent and national origin during disputes.

**B. Background Harassment, National-Origin Animus, and Escalation of Threats**

28. Plaintiff's neighbors, including Bobby Corbin and Tracie Crockrel, engaged in repeated harassment directed at Plaintiff.

29. In or around October 2023, Tracie Crockrel requested Plaintiff's financial assistance to avoid eviction. Plaintiff provided such assistance, and Crockrel and Corbin agreed to perform labor in exchange. After receiving the funds, Crockrel and Corbin failed to complete the agreed labor and escalated hostility toward Plaintiff. In a text message dated November 24, 2023, Tracie Crockrel stated that "nobody in this holler likes you," referencing other neighbors in the community, and told Plaintiff to "take your ass back to Russia."

30. Cindy Isgett, a close friend of Tracie Crockrel and Bobby Corbin, was referenced in text message communications during discussions concerning Plaintiff. Relatives of Cindy Isgett had previously been inside Plaintiff's home as contractors. Thereafter, Tracie Crockrel—who had never been inside Plaintiff's residence—claimed that Plaintiff's foundation was failing and made statements elevating Cindy Isgett and her home over Plaintiff.

31. Following these events, Plaintiff experienced additional threats, repeated surveillance, and continued hostile encounters from multiple individuals in the community.

32. Plaintiff documented these events through security cameras, video recordings, audio recordings, and written records.

33. Plaintiff repeatedly attempted to obtain protection through lawful means.

## C. Plaintiff Reports Death Threats

34. On December 28, 2023, Plaintiff contacted the Lawrence County Sheriff's Office and reported that Corbin ran after Plaintiff onto Plaintiff's property and threatened to kill her. In recorded video, Corbin used ethnic slurs and made hostile statements about Plaintiff's national origin, including calling her a "Russian whore" and screaming: "You Russian, ain't you? You Russian, you're a piece of shit! You do nothing but rip off people, scam people, and I promise you... I fucking promise you, you dumb bitch!" Corbin was further recorded stating that Plaintiff was "going to the ground."

35. Plaintiff informed the Sheriff's Office that she possessed video evidence documenting the threats.

36. Plaintiff sought immediate protection from and prosecution of the aggressor.

37. Plaintiff's report was officially documented and assigned Lawrence County Sheriff's Office Case Number 23S-5590.

## D. Sheriff's Office Handling of Death-Threat Evidence

38. On January 19, 2024, Plaintiff contacted the Lawrence County Sheriff's Office seeking confirmation that the crime report (Case No. 23S-5590) and video evidence had been transmitted to the Lawrence County Prosecutor.

39. However, she was transferred to a report clerk's voicemail stating: "The voice mailbox for this user is full. They cannot receive new messages at this time."

40. On January 22, 2024, a Sheriff's Office dispatcher told Plaintiff that "every case... is turned over to the prosecutor," yet the Prosecutor's Office confirmed that same day that it had no record of the case.

41. On January 23, 2024, Deputy DeLawder assured Plaintiff that the report against Bobby Corbin had been "sent over and signed for on 12/28/23"; however, the Prosecutor's Office did not have the case.

42. On January 30, 2024, during a recorded call with Trisha, a representative of the Lawrence County Prosecutor's Office, Plaintiff was informed that the report and supporting evidence could not be transferred for prosecution without Sheriff Lawless's personal review and approval, and that the file was likely "still sitting on the sheriff's desk."

## E. Plaintiff Attempts Direct Contact With Sheriff Jeff Lawless

43. Following the Prosecutor's disclosure that Plaintiff's evidence was sitting on Sheriff Jeff Lawless's desk, Plaintiff attempted to speak directly with Sheriff Lawless on February 7, 2024, to demand the release of the evidence.

44. Plaintiff personally recorded the call to document the attempt.

45. Plaintiff told the Sheriff's Office dispatcher: "I don't need to talk to any deputy. I really need to talk to the sheriff." During the call, Plaintiff described "death threats... based on my ethnic... national origin," identified Corbin as the source, and stated she had filed a report.

46. The dispatcher confirmed that Sheriff Lawless was unavailable but stated she would deliver Plaintiff's message directly to him, stating: "I will put this in his box."

47. Sheriff Jeff Lawless did not return Plaintiff's call and did not contact Plaintiff thereafter.

**F. Plaintiff's Petitions for Civil Stalking Protection Orders and Reported Violations**

48. On December 28, 2023, Plaintiff petitioned the Lawrence County Court of Common Pleas for Civil Stalking Protection Orders against both Bobby Corbin (Case No. 23 OC 859) and Tracie Crockrel (Case No. 23 OC 860).

49. The Court recognized the immediate danger posed by Bobby Corbin and granted an ex parte Civil Stalking Protection Order against him on December 28, 2023.

50. However, on that same date, the Court denied Plaintiff's request for an ex parte Civil Stalking Protection Order against Tracie Crockrel.

51. The Court denied protection against Crockrel despite Plaintiff submitting evidence that Crockrel had threatened to "take matters into her own hands" regarding a dispute and that Crockrel's children entered Plaintiff's property and were recorded on video striking Plaintiff's security camera mounted on the mailbox and opening Plaintiff's mailbox to look inside.

52. Following a full hearing on January 24, 2024, Magistrate Donald L. McWhorter dismissed the case against Tracie Crockrel on February 14, 2024.

53. Magistrate McWhorter ruled that the evidence of threats and vandalism was "not well taken" and dismissed the petition.

54. After the denial of the protection order against Crockrel, Plaintiff continued to report harassment, and the Sheriff's Office did not take enforcement action against Corbin for reported violations.

55. On February 29, 2024, Plaintiff contacted the Sheriff's Office to report that Corbin was violating his active Protection Order by speeding on a dirt bike within the prohibited 500-foot zone and repeatedly passing Plaintiff's house in the opposite direction from the highway, despite Plaintiff residing at a dead end.

56. Despite the active court order against Corbin, a responding officer refused to intervene, stating: "there's nothing I can do on a public roadway," but filed a report for the Prosecutor's Office (Case No. 24S-00960).

**G. Protection Order Hearing Against Plaintiff: References to David Lambert**

57. On March 11, 2024, a full hearing was held in the Lawrence County Court of Common Pleas regarding Tracie Crockrel's petition for a Civil Stalking Protection Order against Plaintiff (Case No. 24-OC-92).

58. During the hearing, Crockrel admitted under oath that she included her boyfriend, Bobby Corbin, as a protected party in her petition. She acknowledged she was aware that a Protection Order was already in effect against Corbin for Plaintiff's protection at the time she filed.

59. When questioned about firearm displays, Crockrel admitted: "She's never put it in my face and said I'm going to shoot you." While she alleged that Plaintiff shot a gun in a

"threatening way," she admitted she was not the target and did not know what Plaintiff was actually shooting at.

60. During cross-examination, Crockrel admitted that Plaintiff had never come onto her property. She further admitted that Plaintiff had never threatened to shoot her on her property.

61. Crockrel effectively admitted that the "threats" she alleged were "just talk," explicitly agreeing with counsel's statement that "talk is just talk." She further clarified that the specific text message she relied upon as a "threat" actually instructed her not to approach Plaintiff.

62. Crockrel testified, "I want nothing to do with her, and I wish she would just leave me and my family alone. We are not bothering her. Any— my boyfriend rode a dirt bike because he's a mechanic and he just fixed the dirt bike. He took it on a test drive. He rode it up the holler and back. She called the cops, said he was harassing her. Nobody is harassing her. She is blaming everyone for doing exactly what she is doing. No, it is not peaceful out 208 no more. She's tried to bring David Lambert into court. She's tried to bring Sandy, Kathy and Donna in the court."

63. On February 14, 2024, Plaintiff filed a Petition for a Civil Stalking Protection Order against David Lambert (Case No. 24-OC-107). On February 16, 2024, the court

dismissed the petition upon a finding by Magistrate McWhorter that the evidence was "not well taken.

64. Crockrel was not a party to Case No. 24-OC-107.

65. During her March 11, 2024 testimony, Crockrel nevertheless referenced Plaintiff's separate petition against David Lambert by full name.

66. Magistrate McWhorter presided over both Case No. 24-OC-107 (Lambert) and Case No. 24-OC-92 (Crockrel).

67. Randall Lambert, the brother of David Lambert, was a former law partner of Magistrate McWhorter. David Lambert's Mended Reeds Mental Health initially operated from a borrowed office on the second floor of the law firm Lambert, McWhorter & Bowling.

68. The hearing concluded with the Court taking the matter under advisement, with no additional witnesses or corroborating evidence presented to support Crockrel's allegations, and no immediate ruling issued.

**H. March 15, 2024 Arrest and On-Scene Video Evidence**

69. On March 15, 2024, at approximately 10:51 a.m., Defendant Corporal Kodi Pizelli arrived at Plaintiff's residence located at 851 Township Road 208. At approximately 11:10 a.m., Defendant Deputy Chris Frame arrived.

70. The law enforcement encounter occurred in response to an allegation by S. L. that Plaintiff had pointed a firearm at him.

71. Immediately upon their arrival, Plaintiff informed Corporal Pizelli that she did not trust local law enforcement and would only speak with federal authorities, stating: "I don't wanna talk to anyone, sir... I will only talk to FBI, sir... Because your department is in it! And the sheriff is in it!"

72. Despite her fear, Plaintiff remained on her own property behind a gate and attempted to cooperate by proactively presenting exculpatory evidence.

73. Plaintiff also brought her audio recorder and recorded the entire encounter. Defendants were aware that Plaintiff was audio recording the encounter.

74. In his official incident report, Corporal Pizelli claimed that he explicitly "informed dispatch" that Plaintiff would not allow him near her, and that dispatch subsequently sent another unit in response.

75. However, the audio recording of the entire encounter proves Corporal Pizelli never contacted dispatch to report Plaintiff's behavior. Instead, the recording captures Corporal Pizelli admitting that the second unit arrived automatically due to a standard protocol, stating: "Oh, that's just... they come to check on us. Where I been here talking to you for fifteen minutes, if we're not in our car, they just come to make sure we're safe.

76. Plaintiff immediately showed Corporal Pizelli two video recordings at the scene and stated: "Here is one... Here is another one... you seeing all the videos." Corporal Pizelli acknowledged viewing the recordings.

77. The security camera footage showed Plaintiff standing in her driveway holding the firearm pointed downward, and the cell phone recording showed Plaintiff remaining on her driveway and not entering the roadway when S. L. approached her property.

78. Despite viewing both videos and acknowledging the evidence by stating "I see. I see. I see," Corporal Pizelli did not take any investigative steps to reconcile the video evidence with the witness accusations.

79. Plaintiff explained to Corporal Pizelli that she carried her gun because she was scared for her safety, stating, "I have my gun everywhere because I'm scared, okay? Because I'm a female alone."

80. Plaintiff also told the officer that she had never used the firearm in a threatening manner, stating, "I never ever pointed or threatened to kill anyone ever in my life."

81. Plaintiff further explained that her fear arose from the ongoing harassment and from a neighbor who had previously threatened to kill her. Plaintiff stated that she believed other neighbors were assisting him.

**I. The Seizure and Access of Plaintiff's Phone**

82. Despite that, Defendants arrested Plaintiff, handcuffed her with her hands in front of her body, and placed her into the police vehicle while she was still holding her cellular phone in her hands.

83. While confined in the vehicle, Plaintiff unlocked her phone to place calls to her friend and her lawyer and received a call from her loan officer, whom she instructed to call 911.

84. At the time of the seizure, Plaintiff was seated in the police car and making phone calls when her phone was taken directly from her hands by Corporal Pizelli.

85. Corporal Pizelli began interacting with the phone immediately upon seizing it, manipulating the screen, without requesting Plaintiff's consent or presenting a warrant.

86. Plaintiff's phone remained in continuous police custody for approximately three and a half (3.5) months.

87. Corporal Pizelli justified the seizure in his report by claiming he asked Plaintiff to show him the whole video but "she would not," and asserted that the cell phone was routed into evidence "due to it containing video footage of the incident."

**J. Arrest and Milton Depriest**

88. Plaintiff specifically warned officers that the neighbors present at the scene were hostile and that another neighbor had threatened her life, and she explicitly informed them that she had an active protection order against Bobby Corbin.

89. Plaintiff explicitly identified Bobby Corbin as a threat, stating: 'The guy who threatened to murder me... I have a protection order from him,' and informed the officers that his threats were bias-motivated hate crimes tied to her national origin.

90. Plaintiff also identified other neighbors, including Milton Depriest, as individuals who had been stalking her property.

91. Plaintiff further showed video evidence depicting gunfire activities on neighboring property across from Plaintiff's residence, specifically recordings of semi-automatic

gunfire occurring in proximity to Plaintiff's property, though she did not refer to the owner, Cindy Isgett, by name.

92. At approximately 10:27 a.m.—approximately thirty (30) minutes before law enforcement arrived—Plaintiff's security cameras recorded neighbor Milton Depriest driving past Plaintiff's residence toward Michael Long's home, traveling in the opposite direction of his own residence.

93. At approximately 11:28 a.m., while Plaintiff was interacting with Corporal Pizelli, Milton Depriest entered Plaintiff's private property without permission to observe the arrest and dropped a document that appeared to resemble a police report.

94. Corporal Pizelli told Plaintiff that he was "just trying to find out what's going on" and assured her that he could "stop" the neighbors from bothering her, and then stated he wanted to "get a statement" from her and "file a report" for her.

95. Plaintiff wanted to report Milton as one of the harassers but was arrested immediately as soon as she came out of her gate.

96. At approximately 11:35 a.m., while Plaintiff was detained in one of the patrol vehicles making phone calls, Plaintiff's security cameras recorded Milton Depriest alerting officers that Plaintiff was calling 911.

97. Between approximately 11:38 a.m. and 11:39 a.m., Plaintiff's security camera footage recorded Milton Depriest interacting with the arresting officers in a friendly and familiar manner and thanking them for arresting Plaintiff.

98. At approximately 11:40 a.m., shortly after the arrest, Plaintiff's security camera footage recorded Milton Depriest placing a phone call in which he stated to another individual, "...He said, 'Will you fill out a paper?' I said, 'Actually [Absolutely],' I said, 'I watched the whole thing.' He said, 'You seen the five [a punch now]?' Yes, I did. All right. So, we got it. We're good."

99. After Plaintiff was detained, Corporal Pizelli, while in possession of Plaintiff's phone, proceeded in the direction of the dead end where Michael Long resided and remained there for approximately five minutes before returning toward the highway, while Deputy Frame proceeded toward the highway to transport Plaintiff to the police precinct.

**K. Cindy Isgett Mentioned on the Call with Deputy Michael Gore**

100. During the March 15, 2024 arrest encounter, Corporal Pizelli placed a phone call to Chief Deputy Michael Gore at approximately 11:30 a.m., while Plaintiff was detained in one of the patrol vehicles.

101. During that call, at about 11:33 a.m., Corporal Pizelli identified Cindy Isgett by name, stating, "...our neighbor Cindy Is... [Isgett] Cindy...," while attempting to close Plaintiff's house door, as documented by Plaintiff's security camera above her front door.

102. In the discovery materials and his official report, Corporal Pizelli described Isgett merely as 'another neighbor' who 'waived' him down while he was leaving the scene.

103. However, Plaintiff's other security camera footage reflects that at approximately 11:41 a.m., Corporal Pizelli drove past Isgett's property toward the dead end near Michael Long's residence.

104. At approximately 11:47 a.m., when traveling back toward the highway, Corporal Pizelli again passed Isgett's property without stopping.

**L. Refusal to Allow Plaintiff to Secure Her Property and Endangerment of Animals**

105. During the arrest, Plaintiff repeatedly begged Corporal Pizelli to allow her to close and lock her residence, explicitly stating: "Please let me close my house... let me close my door," and informing the officers that the door required a key to lock.

106. While speaking with Chief Deputy Michael Gore on the phone, Corporal Pizelli acknowledged on the recording that Plaintiff's house was open and that her dog was inside, stating: "Her house is open. Well, she's got a dog... It's [pawing] at the door."

107. Despite Plaintiff's pleas, Defendants refused to allow Plaintiff to lock the door. Corporal Pizelli stated on the recording: "So, I shut her door, but it's an old style. It doesn't have a lock. Takes a key."

108. Defendants removed Plaintiff from the property while leaving her residence unlocked and her animals inside without secured access to food, water, or protection.

**M. Request for "Ongoing Problem" Statement to "Upgrade" the Charge**

109. Officers described the situation as an "ongoing issue" and specifically gathered extra witness statements to show the court it was an "ongoing problem." Following these characterizations, the charge was upgraded from Menacing to Aggravated Menacing.

110. Corporal Pizelli did not solicit a statement from Tracie Crockrel at the scene; rather, he encountered her later at the Lawrence County Jail, where she was being booked for an unrelated matter.

111. Upon learning that Crockrel had recently attempted to obtain a protection order against Plaintiff, Corporal Pizelli asked Crockrel if she would provide a written statement regarding Plaintiff's "violent behavior towards neighbors" so it could be "added to this incident report."

112. However, Crockrel's written statement differs from the police statement. Instead of describing that she also met Corporal Pizelli at the jail, she wrote: "I had just went to court trying to apply a protection order... I have turned my evidence to D.L. McWhorter's court."

113. Only days earlier, during Protection Order hearings, Crockrel testified under oath that Plaintiff had never threatened her with violence and had never entered her property.

114. Public court records reflect that Crockrel has prior misdemeanor charges, including assault, domestic violence, three counts of child endangering, and shoplifting. Plaintiff has no criminal history.

115. Despite Crockrel's prior sworn testimony and these prior charges, Corporal Pizelli relied on Crockrel's alleged jail statement, and the charge was upgraded. In addition, a civil protection order was granted against Plaintiff. The order included Bobby Corbin as a protected party and specifically prohibited Plaintiff from "any form of electronic surveillance" on Crockrel, Crockrel's children, and Corbin, which restricted Plaintiff's ability to document further harassment.

**N. Detention and Bond Proceedings**

116. On March 15, 2024, Plaintiff was physically removed from her home office while actively working in her remote role as a Data Scientist for Microsoft.

117. Plaintiff was transported to the Lawrence County Jail and placed into custodial detention.

118. At the time of booking, Plaintiff was informed that she was being held on charges of Menacing and Resisting Arrest.

119. Plaintiff remained detained for approximately nine (9) hours, from approximately 12:00 p.m. until approximately 9:00 p.m.

120. During detention at the jail, Plaintiff informed officers and jail personnel that her residence had been left unlocked and that her animals remained inside the home.

121. Plaintiff expressed concern that her animals did not have secured access to food or water and that hostile neighbors had previously threatened to harm them.

122. Plaintiff repeatedly requested assistance in arranging bond so she could return home to secure her residence and care for her animals.

123. Plaintiff's cellular phone had been seized by law enforcement, and all of her contact information was stored on that device.

124. Because she did not have access to her contacts, Plaintiff was unable to immediately arrange for a bondsman.

125. Plaintiff began attempting to contact a bondsman earlier in the afternoon but was not able to secure bond until approximately 8:30 p.m.

126. Plaintiff was informed that if bond was not posted, she could be held through the weekend.

127. During detention, Plaintiff experienced significant stress and did not eat because she was worried about her home and animals.

128. Plaintiff pleaded with jail staff to facilitate her release, explaining that her animals were alone in an unsecured home and that their safety and survival should not be jeopardized over the pending charges.

129. Plaintiff was ultimately released between approximately 8:30 p.m. and 9:00 p.m. after bond was secured.

130. On March 18, 2024, a formal criminal complaint was filed upgrading the charge from Menacing to Aggravated Menacing.

**O. Prolonged Retention of Plaintiff's Phone**

131. Corporal Pizelli seized Plaintiff's cellular phone while she was seated in the patrol vehicle. The device was unlocked and active at the time it was taken.

132. Immediately after seizing the device, Corporal Pizelli interacted with the phone screen while it remained unlocked.

133. The phone remained in police custody from March 15, 2024, until June 26, 2024.

134. On May 29, 2024, the Lawrence County Court issued a written "Motion and Entry to Release Property" directing that the phone be returned. The phone, however, was returned on June 26, 2024.

135. While the phone remained in police custody, Plaintiff accessed her Blink security camera account and determined that motion-activated recordings corresponding to the March 15, 2024 timeframe were no longer present, including recordings depicting the arrest sequence and the officers' interactions on the property.

**P. Absence of Body-Worn Camera Recording**

136. There was also no recording of the arrest from the officers' body cameras. In his Incident Report, Corporal Pizelli stated: "I turned my recorder on before exiting my vehicle."

137. No body-worn camera recording was produced during the pendency of the criminal proceedings.

### Q. Continued Post-Arrest Harassment and Escalation

138. Following the arrest, Corbin repeatedly violated the active Civil Stalking Protection Order by passing Plaintiff's property within the prohibited distance multiple times, both on foot and in his vehicle.

139. On multiple occasions following the arrest, Corbin approached Plaintiff's property and spoke directly toward Plaintiff's residence in a taunting and mocking manner, demonstrating awareness that law enforcement would not intervene.

140. During the same post-arrest period, other neighboring individuals engaged in similar conduct directed toward Plaintiff.

141. Michael Long and S.L. engaged in ongoing monitoring of Plaintiff's home.

142. Michael Long struck Plaintiff's mailbox with his truck while passing Plaintiff's property.

143. S.L. repeatedly drove slowly past Plaintiff's residence and spoke loudly toward the property through a handheld amplification device.

144. Cindy Isgett repeatedly drove by and stopped near Plaintiff's property, slowing down/stopping and watching Plaintiff and the property on numerous occasions.

145. Individuals associated with Cindy Isgett approached Plaintiff's security cameras and directed verbal insults toward Plaintiff into the cameras.

146. Witnesses—specifically Michael Long, S. L., Milton Depriest, and Cindy Isgett—who stated in the discovery report that they feared Plaintiff would harm them, nevertheless slowed down across from Plaintiffs property and watched her.

147. Before and especially after the arrest, Township Road 208, a dead-end one-way roadway serving only a limited number of identifiable tenants, experienced a significant and unusual increase in vehicle traffic. Under normal circumstances, Plaintiff observed approximately one vehicle every two to three hours on Township Road 208, typically associated with known residents. Following the arrest, multiple unknown trucks and cars repeatedly passed back and forth along Township Road 208 approximately every ten minutes, slowing down near Plaintiff's property, despite the roadway leading only to a small number of residences. This frequency and repetition substantially differed from the ordinary traffic pattern and made the road resemble a through-highway rather than a dead-end residential roadway.

148. Plaintiff was further subjected to nighttime stalking by trucks repeatedly traveling along Township Road 208, making travel to and from the property dangerous.

149. Because Township Road 208 is a dead-end one-way roadway, and Plaintiff was instructed by the court and the prosecutor's office to avoid confronting S. L. and Michael Long for their safety, Plaintiff was forced to either travel at night between approximately 11:00 p.m. and 3:00 a.m. or take a cab.

150. Due to the repeated presence of unfamiliar vehicles and the risk of confrontation, Plaintiff was also afraid to confront her neighbors because she feared they might harm her or have her arrested again without cause.

151. Plaintiff had previously obtained a protection order against Bobby Corbin. However, Tracie Crockrel later petitioned for and obtained a protection order against Plaintiff in which Corbin was listed as a protected party. Plaintiff could not video record Bobby Corbin or Tracie Crockrel approaching, attacking, or harming her.

152. Plaintiff was afraid to pass Corbin's or Crockrel's residence, but this was the only route available for her to exit her property and access the highway.

153. Plaintiff temporarily rented an apartment through Airbnb because the prosecutor's office required that she rent an apartment due to safety concerns raised by her neighbors, and because Plaintiff feared for her safety.

154. On the last day Plaintiff remained at the residence, while she was moving out and following a moving truck transporting her belongings, Cindy Isgett attempted to drive her vehicle between Plaintiff's car and the moving truck.

155. Plaintiff told the movers that if they allowed Cindy Isgett to pass between Plaintiff's vehicle and the moving truck, Plaintiff would not arrive at the storage facility alive.

156. At Plaintiff's request, the driver of the moving truck stopped the vehicle and did not allow Cindy Isgett to cut between Plaintiff and the truck, ensuring that Plaintiff remained directly behind the moving vehicle.

157. Cindy Isgett then followed Plaintiff and the moving truck for several miles, as documented by Plaintiff's dash camera footage.

**R. Criminal Complaint and Prosecution in Ironton Municipal Court**

158. On March 18, 2024, Plaintiff was formally charged in Ironton Municipal Court Case No. CRB2400195A.

159. The criminal complaint relied on witness accusations and a report prepared by Corporal Pizelli, which stated the cell phone was routed into evidence "due to it containing video footage of the incident," treating the recordings as evidence of the offense, even though Plaintiff stated at the scene that she was recording events for her own protection.

160. The Prosecutor proceeded based on the arresting officer's inference that Plaintiff was observed on security footage recording her criminal act and that Plaintiff's cellular device contained evidence supporting the charged offense. The Prosecutor authorized the continued retention of Plaintiff's cellular device and proceeded with charges based on that allegation.

161. The prosecution proceeded for over 100 days (from March 15 to June 27, 2024) while Plaintiff's phone remained in law enforcement custody, and Plaintiff was unable to access the recordings on the device during that period.

**S. Prosecutor's Office and Randall Lambert**

162. Plaintiff met David Lambert on Township Road 208 in 2022. He invited her to receive mental health counseling at Mended Reeds Mental Health, where he was a director.

163. In October 2022, Plaintiff filed a police report against employees of the clinic for vandalizing Plaintiff's property.

164. Following the police report, Plaintiff's access to therapy was terminated, and Plaintiff's therapist stated Plaintiff was removed due to a "conflict of interest."

165. As a result, Plaintiff was denied essential mental health treatment for trauma caused by the clinic itself.

166. On May 27, 2023, Plaintiff sent a formal malpractice warning to David Lambert. Plaintiff documented fraud, property damage, and misconduct by Lambert's staff and stated her intent to pursue litigation if his staff were again observed in the residential area of Township Road 208.

167. On May 28, 2023, less than twenty-four (24) hours after Plaintiff's warning, Randall Lambert—who at that time was an attorney and later became an Assistant Prosecutor—initiated a Google Drive share request seeking access to Plaintiff's private evidence folder titled "Lambert."

168. On March 18, 2024, when the charges against Plaintiff were upgraded, Randall Lambert was one of the Assistant Prosecutors listed on the criminal complaint filed against Plaintiff in Ironton Municipal Court.

**T. Charge Upgrade, Mental-Health Inquiries, and Negotiated Dismissal Conditions**

169. The Lawrence County Prosecutor's Office also upgraded the charge to Aggravated Menacing despite the absence of any new physical evidence.

170. During the proceedings, Defendant Managing Prosecutor Philip J. Heald and the prosecution team actively inquired of Plaintiff's defense counsel regarding Plaintiff's mental health status.

171. Through counsel, Defendant Heald repeatedly inquired about Plaintiff's mental health and suggested that the ongoing situation involving Plaintiff on Township Road 208 was worsening her condition.

172. Plaintiff had previously received treatment at a clinic owned by David Lambert. Plaintiff did not disclose her treatment history to law enforcement or the prosecution.

173. Plaintiff told counsel that she had evidence of neighbors harassing her, not the other way around, but counsel stated that the Prosecutor's Office did not believe that Plaintiff, as a single woman, was a victim of organized harassment and stalking and was confident that Plaintiff was the one threatening the neighborhood.

174. The Prosecutor's Office offered Plaintiff a "Negotiated Dismissal" of the criminal case.

175. Specifically, Defendant Heald, through Plaintiff's counsel, communicated that dismissal of the criminal charges was contingent upon Plaintiff selling her home and permanently

leaving Township Road 208. Plaintiff documented this communication and forwarded confirmation through counsel.

176. Plaintiff's counsel also insisted that Plaintiff report her mental health condition to her employer.

177. Plaintiff was terminated from her employment three (3) weeks after disclosing her mental health condition, specifically that she might fall into depression due to the ongoing harassment and she needed additional days off for moving and restoring her health.

178. This termination caused Plaintiff serious documented emotional distress, career damage, and serious financial deterioration.

179. Plaintiff was forced to sell her house and move to another state or county because she no longer felt protected in Lawrence County, Ohio.

**U. Dismissal Timing and Exculpatory Evidence**

180. Plaintiff regained access to her cellular phone and the video recordings stored on it on June 26, 2024, after the device had been held in law enforcement custody for 103 days.

181. The return occurred twenty-nine (29) days after the court issued its May 29, 2024 order directing release of the property.

182. On June 27, 2024, the day immediately following Plaintiff's recovery of the phone and restoration of access to the video evidence, the criminal charges against her were dismissed. Plaintiff was informed that the related criminal records would be expunged.

183. The prosecution was maintained throughout the entire period during which the phone—and the recordings documenting the incident—remained inaccessible to Plaintiff.

184. Once Plaintiff recovered the video evidence and it became available to the court, the case was terminated in her favor and expungement followed.

## V. Damage and Direct Harm to Plaintiff

185. As a direct and proximate result of Defendants' actions, significant injuries and damages were incurred.

186. During the detention, severe psychological trauma occurred, including extreme distress regarding the safety of an unsecured home and her animals.

187. During these events, Plaintiff was treated differently in ways she believes were based on her national origin, foreign accent, and perceived outsider status.

188. Reputational harm and humiliation followed, compounded by severe harassment that created a substantial risk of serious bodily harm.

189. For months, multiple known and unknown cars and trucks repeatedly drove up and down, slowing near Plaintiff's residence and watching her. Some vehicles honked their horns.

190. Plaintiff also documented a truck at night slowly driving around and observing her property.

191. Plaintiff experienced constant fear of violence and retaliation and was afraid to seek lawful protection because of the arrest she encountered and the absence of any effective remedy against her harassers, resulting in severe trauma and emotional distress, including from unenforced protection orders against violent neighbors.

192. Plaintiff suffered damages associated with legal defense costs and fees, relocation expenses, storage rental, renting apartments outside of her residence, cab fares, purchasing additional security measures such as cameras, buying a new cell phone, and paying real estate agents for selling and moving in and out of her house.

193. This resulted in a profound loss of security and safety on her own property and a prolonged fear for her life that persists whenever she visits Lawrence County.

194. Prior to the incidents giving rise to this action, Plaintiff had been diagnosed with Post-Traumatic Stress Disorder (PTSD) and depression, conditions that were stable and managed. Following the incidents, both conditions were severely exacerbated, with Plaintiff experiencing a marked worsening of PTSD symptoms and a significant deepening of depression. Plaintiff's treating healthcare providers documented the development of additional serious conditions, including severe institutional trauma, a severe form of Generalized Anxiety Disorder (GAD), chronic insomnia, and ongoing trauma-related distress. Plaintiff experiences hypervigilance and fear responses upon observing neighbors near her property. A documented fear of law enforcement developed, manifesting as panic attacks and flashbacks upon encountering police vehicles. Plaintiff further developed a profound distrust of the legal system and legal counsel. These conditions are ongoing and debilitating.

195. The situation necessitated an involuntary relocation and the sale of a 3,000-square-foot home in Ohio under pressure, as well as the purchase of a new home in Catlettsburg, Kentucky. The Ohio property, which had received approximately $50,000 in renovations, featured a 1,000-square-foot finished basement, luxury oak wood trim, two full bathrooms, two half bathrooms, a 20x40 pool, and 31 acres of land.

196. Because of the circumstances, it was sold for less than its intended value.

197. The move resulted in Plaintiff relocating to a roughly 1,500-square-foot home on 28 acres in Kentucky with significantly reduced amenities, including the absence of a pool, basement, and comparable living space.

198. In addition, Plaintiff lost her original interest rate. When she purchased a house in Ohio, her interest rate was 2.8%, and now it is 5.7%.

199. The chain of events, originating in Ironton, Ohio, led to other financial devastations.

200. After being terminated from Microsoft, the cascade of instability severely impacted Plaintiff's employment. Currently, the Kentucky home is at risk of foreclosure due to mortgage delinquency, creating a looming threat of homelessness. Additionally, Plaintiff incurred significant credit card debt. She currently has between $40,000 and $50,000 in credit card debt as a result of her termination from Microsoft.

201. This job loss significantly worsened the major depression. An extremely difficult job market has made it impossible to repair this career damage, inducing further health complications and necessitating a petition for Social Security Disability.

202. All of these extensive damages have been documented with supporting letters from healthcare providers and financial institutions.

## IV. PRIOR FEDERAL CIVIL RIGHTS LITIGATION AGAINST THE LAWRENCE COUNTY SHERIFF'S OFFICE

The following facts document a pattern of conduct within the Lawrence County Sheriff's Office spanning from 2008 through 2022, as established through prior federal civil rights lawsuits, federal indictments, court orders, civil rights settlements, dismissed criminal charges, and publicly reported incidents involving deputies under Sheriff Jeff Lawless's direct command.

### A. Suppressing, Concealing, and Destroying Evidence of Misconduct

203. In multiple incidents spanning from 2008 through at least 2022, evidence relevant to the conduct of Lawrence County Sheriff's deputies was manipulated, obstructed, withheld, or not preserved. Sheriff Lawless was named as a defendant in multiple federal civil rights lawsuits arising from these incidents. He received direct notice of these events through federal indictments, court orders, a civil rights settlement, and repeated lawsuits. The same deputies who were the subjects of these incidents continued to appear in subsequent federal lawsuits, as documented below.

204. In Patrick v. Lawless, No. 1:9-cv-00608-MRB (S.D. Ohio, W.D.), arising from an August 19, 2008 incident in which Deputy Charles Hammonds tasered bicyclist Anthony Patrick for lawfully riding his bicycle on a public road, key evidence—including a videotape recorded at the scene of the tasering—was never provided to Patrick's criminal or civil lawyers during the course of the litigation. The court in the underlying criminal

proceeding found Deputy Hammonds's order to stop was "unlawful" and that Patrick had done nothing wrong, after which the prosecution dismissed all charges. Sheriff Lawless was personally named as a defendant in the resulting federal civil rights action, which settled in 2010.

205. In Kinstler v. Lawrence County, No. 1:15-cv-139 (S.D. Ohio), arising from a 2014 incident at the Lawrence County Jail, Deputy Jason Mays physically positioned himself in front of the jail's surveillance camera while Deputies Jeremy Hanshaw and Ronald Hatfield assaulted a handcuffed inmate—deliberately blocking the video record of the use of force. All three deputies were subsequently indicted by a federal grand jury for their abuse of the inmate. The separate civil rights lawsuit was settled by Lawrence County. Sheriff Lawless was named as a defendant.

206. In Anderson v. Lawless, No. 1:18-cv-380 (S.D. Ohio), arising from a December 2016 excessive-force incident at the same jail involving Deputy Hatfield—the same deputy from Kinstler—the plaintiff alleged that photographs documenting his injuries either were not taken or were not preserved, despite jail policies requiring such documentation. The court ordered Defendants to produce any additional photographs, incident reports, "chair check" logs, and "medical check" logs—or to explain whether such records had existed and were not preserved, or were never created. Sheriff Lawless was named as a defendant.

207. In Assi v. Hanshaw, No. 1:20-cv-839 (S.D. Ohio), the same Deputy Hanshaw from Kinstler was the subject of a second federal lawsuit wherein it was alleged that the brightness levels on a jail surveillance camera were deliberately adjusted so that hearing-impaired inmate Hassan Assi's written notes could not be read on the video recording.

208. On August 5, 2020, off-duty Deputy Jason Newman—a detective with the Lawrence County Sheriff's Office—ran a red light while intoxicated and struck a vehicle carrying three teenage girls, injuring the driver and a passenger. Despite the fact that Newman was allegedly visibly intoxicated and had a strong odor of alcohol, he was not given a field sobriety test. Instead, according to the civil lawsuit filed by the injured driver's parent, Lawrence County Sheriff's deputies who arrived at the scene "instructed or requested" the Ohio State Highway Patrol not to dispatch a trooper to the scene, and Deputy Steve Sisler of the Lawrence County Sheriff's Office took over the investigation. Newman was charged only with failure to yield to a traffic signal. Sheriff Lawless publicly acknowledged that the matter raised questions but kept Newman on active duty.

209. Sheriff Lawless was named as a defendant in the lawsuits arising from Patrick (2008), Kinstler (2014), Anderson (2016), and Assi (2020). He was aware of the federal indictment of three of his deputies in Kinstler and the civil rights settlement in Patrick.

**B. Fabricating Official Documentation and Filing Baseless Criminal Charges Against Victims**

210. In multiple incidents spanning from 2008 through at least 2022, Lawrence County Sheriff's deputies filed criminal charges that were subsequently dismissed by courts or abandoned by prosecutors.

211. In Patrick v. Lawless, No. 1:9-cv-00608-MRB (S.D. Ohio, W.D.), Deputy Charles Hammonds tasered bicyclist Anthony Patrick on August 19, 2008, after Patrick told the deputy he had a right to be on the road, and then charged Patrick with a series of offenses including "Riding a Bicycle on the Roadway," resisting arrest, and failing to obey a lawful order. After a hearing at which Deputy Hammonds was the sole witness, the court issued a written opinion holding that the deputy's order to stop was unlawful and that Patrick had done nothing wrong. The prosecution then dismissed all charges. Sheriff Lawless was personally named as a defendant in the resulting federal civil rights action, which settled in 2010.

212. In Kinstler v. Lawrence County, No. 1:15-cv-139 (S.D. Ohio), Deputies Hanshaw, Hatfield, and Mays filed official reports following the 2014 assault on a handcuffed inmate at the Lawrence County Jail that were sufficiently inconsistent with other evidence—including Detective Bollinger's own investigation—to support federal criminal indictments of all three deputies. Detective Bollinger's report described the treatment of the inmate as "not unusual," indicating that the manner in which incidents were reported and documented was itself a recognized internal practice rather than an aberration. Sheriff Lawless was aware that a federal grand jury had indicted deputies Hanshaw, Hatfield, and Mays for falsifying reports and covering up the assault of an

inmate. Despite those indictments, Sheriff Lawless retained all three deputies on active duty.

213. In Sprouse v. Mitchell, No. 1:23-cv-353 (S.D. Ohio), Detective Jason Newman of the Lawrence County Sheriff's Office arrived at plaintiff Ruben Sprouse's residence on June 18, 2021, with a search warrant and two additional deputies. Newman kept his hand on his firearm, threatened Sprouse with arrest, and presented a document that he represented was merely authorization for a veterinary check of Sprouse's dogs on his property. Sprouse signed the document. According to the complaint, Sprouse was not informed of the document's true nature. The document was in fact a release of Sprouse's dogs to the Lawrence County Humane Society, and 67 dogs were immediately removed from the premises. Criminal charges were then filed against Sprouse but subsequently dismissed. After the charges were dismissed, only 7 of the 67 dogs were returned. The court allowed Sprouse's Fourteenth Amendment due process claims against Newman to proceed. Newman was a detective with the Lawrence County Sheriff's Office under Sheriff Lawless's command.

214. In Stager v. Hanshaw, No. 1:23-cv-120 (S.D. Ohio), Deputy Hanshaw—the same deputy from Kinstler and Assi, now the subject of his third federal lawsuit—assaulted Zander Stager on February 28, 2022, using unnecessary physical force including a pressure point technique under the jaw and joint manipulation against a man found asleep in his vehicle. Hanshaw then charged Stager with Obstructing Official Business. Days later, Hanshaw filed an additional charge of Resisting Arrest. Both charges were resolved

by the prosecutor's entry of a nolle prosequi. Sheriff Lawless was named as a defendant. Hanshaw remained employed by the Lawrence County Sheriff's Office at the time of this incident despite the prior federal indictment and two prior federal civil rights lawsuits.

215. Across Patrick (2008), Kinstler (2014), Sprouse (2021), and Stager (2022), criminal charges filed by Lawrence County Sheriff's deputies were either dismissed by courts, abandoned by prosecutors through nolle prosequi, or resulted in federal indictments of the deputies themselves. In Patrick, the court found the deputy's order was unlawful. In Kinstler, the deputies' reports were sufficiently inconsistent with other evidence to support federal indictments. In Sprouse and Stager, the charges were abandoned by the prosecution. Sheriff Lawless was named as a defendant in multiple resulting lawsuits. Each of the deputies involved in these incidents continued to serve in the Lawrence County Sheriff's Office and appeared as defendants in subsequent federal lawsuits. Sheriff Lawless was aware of the federal indictment, the multiple nolle prosequi dispositions, and the judicial findings, and the same deputies continued to be named in subsequent federal lawsuits.

**C. Favoritism, Selective Enforcement, and Protection of Insiders**

216. Throughout the period documented above, deputies who were the subjects of federal civil rights lawsuits, federal indictments, and dismissed criminal charges remained employed by the Lawrence County Sheriff's Office. Sheriff Lawless retained each of these deputies, as evidenced by their continued appearance in subsequent federal

lawsuits. The following paragraphs document the continued employment of specific deputies across successive incidents.

217. In Kinstler v. Lawrence County, No. 1:15-cv-139 (S.D. Ohio), Deputies Jeremy Hanshaw, Ronald Hatfield, and Jason Mays were federally indicted for the assault of a handcuffed inmate at the Lawrence County Jail in 2014. Following the deputies' acquittal on the beyond-a-reasonable-doubt criminal standard—a standard that was never tested under the civil preponderance-of-the-evidence standard, as the case did not proceed to civil trial—Sheriff Lawless retained all three deputies without discipline or reassignment.

218. Following his retention after the federal indictment in Kinstler (2014), Hanshaw became the subject of a second federal civil rights lawsuit, Assi v. Hanshaw, No. 1:20-cv-839 (S.D. Ohio), alleging abuse of a hearing-impaired inmate at the same jail—including placing the inmate in a restraint chair as punishment, calling him a slur related to his disability, entering his cell with a Taser drawn and strobe light activated, and manipulating camera evidence. Sheriff Lawless was named as a defendant. Hanshaw continued to serve in the Sheriff's Office. Hanshaw then became the subject of a third federal lawsuit, Stager v. Hanshaw, No. 1:23-cv-120 (S.D. Ohio), alleging excessive force against a civilian on the street. Sheriff Lawless was again named as a defendant. At no point during this eight-year span—from federal indictment through three separate federal civil rights actions—was Hanshaw removed from duty or reassigned, as evidenced by his continued appearance as a defendant in each successive lawsuit.

219. Deputy Ronald Hatfield followed the same trajectory. Hatfield was federally indicted alongside Hanshaw in Kinstler (2014) and retained. Two years later, Hatfield was the subject of new excessive-force allegations at the same jail in Anderson v. Lawless, No. 1:18-cv-380 (S.D. Ohio), in which he and other deputies were accused of using excessive force against an inmate—including Deputy Spoljarik slamming a door against the inmate's head and causing him to be thrown to the ground while strapped in a restraint chair, in retaliation for the inmate's use of the jail's grievance system. Sheriff Lawless was again named as a defendant. Hatfield continued to serve in the Sheriff's Office.

220. On August 5, 2020, Newman—while off duty—ran a red light while intoxicated and struck a vehicle carrying three teenage girls, injuring the driver and a passenger. According to the civil lawsuit filed in the Circuit Court of Cabell County, West Virginia, a social media video taken shortly before the accident showed Newman visibly intoxicated, and the injured driver's parent detected a strong odor of alcohol at the scene. Yet Newman was not given a field sobriety test. On-duty Lawrence County deputies who arrived at the scene actively intervened to prevent the Ohio State Highway Patrol from conducting an independent investigation, and Deputy Sisler took over the case. Newman was charged only with failure to yield to a traffic signal. Sheriff Lawless publicly acknowledged that the matter raised questions and requested an outside investigator—but kept Newman on active duty, citing due process and the bargaining agreement, despite the allegation that his own deputies had actively shielded Newman from a standard DUI investigation. One year later, Newman was named as a defendant in Sprouse v. Mitchell, No. 1:23-cv-353 (S.D. Ohio), in which he was alleged to have coerced a citizen's

signature under threat of arrest, misrepresented the nature of a legal document, and facilitated the filing of criminal charges that were later dismissed—resulting in the permanent deprivation of 60 of 67 seized dogs. Newman remained employed by the Lawrence County Sheriff's Office throughout this period.

221. In Templeton v. Brandt, No. 1:20-cv-34 (S.D. Ohio), during the transport of the arrested Mayor of Chesapeake, Deputy Brandt placed a phone call to Sheriff Lawless. According to the complaint Lawless offered to release the Mayor in exchange for the Mayor's agreement not to speak to his neighbor. The court found this sufficient to plausibly allege that Lawless ratified Brandt's conduct.

222. By the time Plaintiff in the present case was arrested on March 15, 2024, Sheriff Lawless had been named as a defendant or had his office named as a defendant in at least seven prior federal civil rights actions arising from the conduct of his deputies. Three of his deputies had been federally indicted. At least one case had resulted in a confidential settlement. Multiple sets of criminal charges filed by his deputies had been abandoned by prosecutors through nolle prosequi or dismissed by courts. The same deputies—Hanshaw, Hatfield, Spoljarik, and Newman—appeared as defendants in successive lawsuits spanning years. Sheriff Lawless was present and involved in at least one arrest, as the court found in Templeton. Sheriff Lawless was aware of the federal indictments, the lawsuits, the settlement, the dismissed charges, and the court orders. Each of the deputies documented above—Hanshaw, Hatfield, Spoljarik, and Newman—continued to

serve in the Lawrence County Sheriff's Office and appeared as defendants in successive federal lawsuits spanning years after their initial involvement.

## V. CAUSES OF ACTION (COUNTS)

### COUNT 1

### Fourth Amendment Violation – Unlawful Seizure and Prolonged Retention of Property (Cell Phone) (42 U.S.C. § 1983)

Defendants: Corporal Kodi Pizelli (Individual Capacity)

223. Plaintiff incorporates ¶¶82–84, 86–87, 131–134, 161, 180–184, 191, and 192 as if fully restated.

224. The Fourth Amendment protects citizens from unreasonable seizures of their personal property.

225. On March 15, 2024, while acting under color of state law, Corporal Kodi Pizelli and Deputy Chris Frame arrested Plaintiff, handcuffed her, and placed her into the police vehicle while permitting her to still hold her cellular phone in her hands. (¶82)

226. While confined in the vehicle, Plaintiff unlocked her phone to place calls for help, including to her friend and her lawyer, and answered a call from her loan officer. (¶83)

227. Only after Plaintiff started actively speaking on the phone did Corporal Pizelli physically seize the unlocked device directly from her hands. (¶84)

228. In his discovery and incident reports, Corporal Pizelli justified this seizure by claiming the phone contained "incriminating" video evidence of the incident. However, this justification is demonstrably pretextual and logically flawed. If the officers genuinely believed the phone contained critical evidence of a crime, they would not have permitted Plaintiff to retain the device in her hands when initially securing her in the police cruiser. (¶87)

229. The delayed timing of the seizure—occurring only when Plaintiff began communicating with outside parties—demonstrates that the phone was seized to illegally isolate her and prevent her from calling for help, not to lawfully preserve evidence. (¶84)

230. Corporal Kodi Pizelli executed this seizure without a warrant, without Plaintiff's consent, and absent any exigent circumstances.

231. Corporal Kodi Pizelli caused Plaintiff's phone to be held in law-enforcement custody following the seizure. (¶¶86, 133)

232. Despite a court order dated May 29, 2024, directing the return of the property, the phone was not returned to Plaintiff until June 26, 2024. (¶134)

233. This prolonged retention prevented Plaintiff from accessing the phone and its stored video recordings during the pendency of the criminal case against her. (¶¶133, 161)

234. Damages: As a direct and proximate result of this seizure and prolonged retention, Plaintiff suffered the deprivation of her personal property, financial loss, the inability to access her video recordings during her criminal proceedings, and emotional distress. (¶86, ¶¶131–134, ¶161, ¶¶180–184, ¶191, ¶192)

## COUNT 2

### Fourth Amendment Violation – Unlawful Search of Digital Contents (42 U.S.C. § 1983)

Defendant: Corporal Kodi Pizelli (Individual Capacity)

235. Plaintiff incorporates ¶¶85, 99, 132, 134–135, 161, 183, and 191 as if fully restated.

236. Absent consent or exigent circumstances, officers must obtain a warrant to search the digital contents of a cell phone, even if the phone was lawfully seized.

237. Immediately after seizing Plaintiff's unlocked phone directly from her hands while she was on an active call, Corporal Pizelli, acting under color of state law, physically manipulated the screen and interacted with the device to access its digital contents. Security cameras subsequently recorded Corporal Pizelli taking the device toward the property of Michael Long after the arrest. (¶¶85, 99)

238. This physical manipulation and access of the digital interface was performed without a warrant, without Plaintiff's consent, and without exigent circumstances. (¶85)

239. When Plaintiff accessed her Blink security camera account, she determined that motion-activated recordings corresponding to the March 15, 2024 timeframe were no longer present, including recordings depicting the arrest sequence and the officers' interactions on the property. Specifically, Plaintiff discovered that all recordings for the date of the arrest from her Blink security camera facing the gate were missing. (¶135)

240. These missing recordings specifically depicted the arrest sequence and officer interactions on the property. Because Plaintiff's gate camera is motion-activated, it normally records automatically during any physical presence. The complete absence of footage—despite the significant physical activity of multiple officers and neighbors during the arrest—strongly suggests that the phone was unlawfully accessed and altered while in the exclusive custody of law enforcement.

241. Damages: As a direct and proximate result of the warrantless access to Plaintiff's phone, Plaintiff suffered an invasion of digital privacy and emotional distress. After the phone was returned, Plaintiff discovered that specific recordings from her gate security camera for the date of the arrest were missing and Plaintiff has been unable to recover those recordings, causing loss of digital property, the destruction of exculpatory evidence, and the inability to use those recordings during her criminal proceedings. (¶85, ¶132, ¶¶134–135, ¶161, ¶183, ¶191)

## COUNT 3

## Fourth Amendment Violation – Unreasonable Seizure of Person (Unlawful Investigatory Detention) (42 U.S.C. § 1983)

Defendants: Corporal Kodi Pizelli and Deputy Chris Frame (Individual Capacities)

242. Plaintiff incorporates ¶¶72, 76–78, 82, 84, 116–117, 119, 127, 176–178, 186, and 200 as if fully restated.

243. The Fourth Amendment protects citizens from unreasonable physical seizures and detentions.

244. On the morning of March 15, 2024, Plaintiff was actively working during her scheduled hours in her remote role as a Data Scientist for Microsoft. Her home functioned as her primary workplace. (¶116)

245. Plaintiff had briefly stepped outside onto her own property when law enforcement arrived. Before Defendants placed Plaintiff into a police vehicle and transported her to the county jail, Plaintiff presented video evidence directly to Defendants Pizelli and Frame. (¶¶72, 76)

246. The video evidence unequivocally showed Plaintiff remaining on her own property, not entering the roadway, and not pointing a weapon. (¶77)

247. After viewing those videos, Defendants, acting under color of state law and absent any warrant or probable cause, detained and handcuffed Plaintiff at the scene and placed her into a police vehicle; Plaintiff was not free to leave. (¶¶78, 82)

248. By executing this unlawful seizure between 11:00 AM and noon, Defendants forcibly removed Plaintiff from her property and her workplace right before her scheduled daily noon (EST) stand-up meeting. Because Defendants also unlawfully seized her phone, Plaintiff abruptly "disappeared" from her job without any ability to notify her employer or colleagues. (¶¶84, 116)

249. Damages: As a direct and proximate result of this detention, Plaintiff suffered physical discomfort from the handcuffs, public humiliation as she had to tell her employer that she had been arrested and placed in jail, deprivation of liberty, and emotional trauma. Furthermore, being forcibly taken from her livelihood during working hours caused Plaintiff extreme psychological panic regarding the loss of her job and resulted in severe disruption to her professional life.( ¶82, ¶116, ¶117, ¶119, ¶127, ¶¶176–178, ¶186, and ¶200)

**COUNT 4**

**Fourth Amendment Violation – False Arrest (42 U.S.C. § 1983)**

Defendants: Corporal Kodi Pizelli and Deputy Chris Frame (Individual Capacities)

250. Plaintiff incorporates ¶¶76, 87, 99, 119, 177, 179, 182–184, 186, 188, 191, 194–195, and 200 as if fully restated.

251. The Fourth Amendment prohibits law enforcement officers from executing a custodial arrest without a warrant or probable cause.

252. Prior to placing Plaintiff under arrest, Plaintiff proactively presented, and Corporal Kodi Pizelli physically viewed, two separate and highly exculpatory videos—one from Plaintiff's security camera and another on her cell phone. (¶76)

253. These videos unequivocally proved Plaintiff's innocence, showing that she was standing on her own property, did not enter the roadway, and did not point a weapon at anyone.

254. Because these videos objectively disproved the complaining neighbors' false allegations, their presence immediately dissolved any arguable probable cause for an arrest. Yet Corporal Kodi Pizelli willfully blinded himself to this clear exculpatory evidence, and Deputy Chris Frame took Plaintiff into custody on an Aggravated Menacing charge without a warrant or independent investigation.

255. Defendants arrested Plaintiff without probable cause, despite having already viewed objective video evidence at the scene that refuted the essential factual basis for the Aggravated Menacing charge. The same recordings Kodi Pizelli ignored and mischaracterized as "incriminating" later exonerated Plaintiff: immediately after Plaintiff regained access to the withheld footage and provided it for use in her defense, the criminal charges were dismissed, and Plaintiff's record was expunged. (¶¶87, 182–184)

256. Damages: As a direct and proximate result of this false arrest, Plaintiff suffered a profound loss of liberty, reputational harm, and the financial devastation of a forced home sale and job loss. Plaintiff also suffered severe psychological distress and trauma. During the transport, Plaintiff repeatedly begged Deputy Frame not to murder her, reflecting the extreme fear she experienced while being taken into custody. (¶99, ¶119, ¶177, ¶179, ¶186, ¶188, ¶191, ¶194, ¶195, ¶200)

## COUNT 5

### Fourth and Fourteenth Amendment Violations – False Imprisonment (42 U.S.C. § 1983)

Defendants: Corporal Kodi Pizelli and Deputy Chris Frame (Individual Capacities)

257. Plaintiff incorporates ¶¶ 76, 78, 84, 105–108, 117–119, 123–125, and 129 as if fully restated.

258. The Fourth and Fourteenth Amendments prohibit the detention of a citizen without legal justification, probable cause, or legal process.

259. As established in ¶¶ 117 and 119, Deputy Chris Frame transported Plaintiff to the Lawrence County Jail and confined her in custodial detention for approximately nine (9) hours.

260. This prolonged confinement was executed entirely without legal process, a magistrate's review, or a judicial determination of probable cause, and was initiated after Corporal Kodi Pizelli had already viewed exculpatory evidence proving Plaintiff's innocence (¶¶ 76–78).

261. Furthermore, Plaintiff's release from this extrajudicial detention was unreasonably prolonged and obstructed by the unlawful seizure of her cellular phone (¶84), which deprived her of the contacts necessary to secure a bondsman (¶¶ 123–124).

262. This arbitrary confinement was maintained for approximately 9 hours despite actual knowledge that Plaintiff had been forcibly removed while her residence was left unlocked and her animals remained inside without secured access to food, water, or protection from hostile neighbors (¶¶ 105–108).

263. Plaintiff's eventual release was solely the result of her persistent efforts to secure bond after hours of obstruction, not the result of any lawful judicial process or finding (¶¶125–129).

264. Damages: As a direct and proximate result of this false imprisonment without legal process, Plaintiff suffered severe deprivation of liberty, psychological trauma, and extreme emotional distress regarding her unsecured home and animals, as detailed in ¶¶120–128 and 186–195.

**COUNT 6**

**Fourteenth Amendment Due Process Violation – Interference with Access to Material Exculpatory Evidence (42 U.S.C. § 1983)**

Defendants: Corporal Kodi Pizelli (Individual Capacity)

265. Plaintiff incorporates ¶¶77, 82–85, 87, 133–134, 159, 161, 178–184, 188, 191, and 195–196 as if fully restated.

266. The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from state interference with access to material exculpatory evidence during the pendency of a criminal prosecution.

267. On March 15, 2024, while acting under color of state law, Corporal Kodi Pizelli seized Plaintiff's cellular phone without a warrant, and the device contained video recordings from the incident. (¶¶82–85)

268. In official communications, Corporal Kodi Pizelli described the video on the phone as "incriminating". The video recordings actually showed Plaintiff standing on her property and not pointing a weapon. (¶¶77, 87)

269. The phone and the video recordings it contained remained in law-enforcement custody from March 15, 2024, until June 26, 2024, while the criminal prosecution against Plaintiff was pending. (¶133)

270. Plaintiff tried multiple times to contact the Sheriff's Office and jail to release the phone. Plaintiff possesses recorded conversations from March 29, 2024, to June 26, 2024,

showing she faced obstructions; she was repeatedly told that someone would call her, but nobody did.

271. A court order dated May 29, 2024, directed the return of Plaintiff's property; nevertheless, the phone was not returned until June 26, 2024. (¶134)

272. During the period the phone remained in law-enforcement custody, Plaintiff was unable to access the phone and its stored recordings for use in her defense in the pending criminal case. (¶¶133, 161)

273. The materiality of this withheld evidence is demonstrated by the fact that the criminal charges against Plaintiff were dismissed on June 27, 2024, the exact day after she recovered her phone and provided the exculpatory video to the court. (¶182)

274. Damages: As a direct and proximate result of the retention, characterization, and obstruction of this evidence during the pendency of the prosecution, Plaintiff suffered a prolonged prosecution, reputational damage, the inability to use the video recordings in her defense, and emotional distress. Furthermore, Plaintiff suffered severe financial injury; specifically, Plaintiff could have legally stopped the forced sale of her house if her phone had been returned when she contacted them following the May 29 court order or in early June. However, because the phone was withheld until June 26, the sale of the house was practically finalized. (¶87, ¶¶133–134, ¶159, ¶161, ¶¶178–184, ¶188, ¶191, ¶¶195–196)

## COUNT 7

### Fourteenth Amendment Violation – Fabrication of Evidence and Falsification of the Record (42 U.S.C. § 1983)

Defendants: Corporal Kodi Pizelli and Chief Deputy Michael Gore (Individual Capacities)

275. Plaintiff incorporates ¶¶73–78, 87, 91, 100–104, 110–113, 118, 136–137, 159, 161, 177–180, 186, 188, 191–192, and 194–201 as if fully restated.

276. The Due Process Clause of the Fourteenth Amendment prohibits state actors from fabricating material evidence or falsifying official investigative records in a manner that influences a criminal prosecution. Each of the fabrications and omissions described below was material in that it directly shaped the decision to upgrade the criminal charge from Menacing to Aggravated Menacing and to sustain a prosecution against Plaintiff for approximately three months.

277. Corporal Kodi Pizelli's reports and actions included the following false and misleading statements and omissions:

278. (A) In his official incident report, Corporal Pizelli claimed that he explicitly "informed dispatch" that Plaintiff would not allow him near her, and that dispatch subsequently sent

another unit in response. This account is directly contradicted by Plaintiff's audio recording of the encounter, which proves Corporal Pizelli never contacted dispatch to report Plaintiff's behavior. Instead, the recording captures Corporal Pizelli admitting that the second unit arrived automatically due to a standard safety protocol, stating that if officers are out of their car talking for fifteen minutes, a second unit is automatically sent to check on them. (¶¶74–75) This discrepancy indicates that the arrest was preplanned.

279. (B) Solicitation of a Statement Designed to "Show the Court This Is an Ongoing Problem": Corporal Pizelli approached Tracie Crockrel at the Lawrence County Jail—where Crockrel was being booked on an unrelated matter—and explicitly requested a written statement regarding Plaintiff's "violent behavior towards neighbors" to be "added to this incident report," stating he needed it "to show the court this is an ongoing problem." This solicitation occurred with full knowledge that, only days earlier, Crockrel had testified under oath at a Protection Order hearing that Plaintiff had never threatened her and had never entered her property. The statement Crockrel thereafter provided was used to upgrade the charge from Menacing to Aggravated Menacing, notwithstanding her directly contrary sworn testimony. (¶¶110–113)

280. (C) False Claim That Plaintiff Refused to Provide Video and That the Footage Was Incriminating: At the scene, Plaintiff proactively showed officers multiple video recordings, stating "Here is one... Here is another one... you seeing all the videos." The recordings included security camera footage depicting Plaintiff standing in her driveway with the firearm pointed downward, cell phone footage showing Plaintiff remaining on

her driveway without entering the roadway when S.L. approached, and additional footage depicting semi-automatic gunfire on neighboring property in proximity to Plaintiff's residence. Corporal Pizelli acknowledged viewing the recordings, stating "I see. I see. I see," and took no documented investigative steps to reconcile the footage with the complaining witnesses' accusations. (¶¶76–78, 87, 91)

281. Corporal Pizelli nonetheless justified the seizure of Plaintiff's phone by claiming that Plaintiff had refused to show the full footage — directly contradicting the audio recording of Pizelli's own acknowledgment — and by characterizing the video as incriminating, asserting that Plaintiff had "recorded herself" committing the charged offense. The footage Plaintiff showed was exculpatory on its face. The written characterization of that same footage as incriminating evidence of the offense, and the false claim that Plaintiff withheld it, constitutes an affirmative fabrication of the investigative record. (¶¶73, 76–78, 87, 159)

282. (D) False Account Regarding Witness Cindy Isgett: Corporal Pizelli's report states that he did not know Cindy Isgett and that she merely "waved him down" as he was driving away. This account is contradicted by two independent sources. First, Plaintiff's security camera captured audio of Corporal Pizelli identifying Cindy Isgett by name during a phone call with Chief Deputy Michael Gore while Plaintiff was detained in the patrol vehicle, before any alleged chance encounter with Isgett. Second, Plaintiff's exterior security camera footage shows Corporal Pizelli driving past Isgett's property at approximately 11:41 a.m. toward the dead end near Michael Long's residence, and again

at approximately 11:47 a.m. on his return trip, without stopping—directly undermining the account that Isgett spontaneously flagged him down as he left the scene. (¶¶100–104) By participating in the call and possessing contemporaneous knowledge that Pizelli already knew and identified Cindy Isgett before the alleged roadside encounter, Chief Deputy Michael Gore knowingly acquiesced in, ratified, or caused the falsified narrative to remain in the official record.

283. (E) Unproduced Body-Worn Camera Footage and Disappearance of Security Recordings from Plaintiff's Seized Phone: Corporal Pizelli stated in his incident report: "I turned my recorder on before exiting my vehicle." Notwithstanding that representation, no body-worn camera footage was ever produced or disclosed to Plaintiff during the pendency of the criminal proceedings. (¶¶136–137)

284. Damages: As a direct and proximate result of the fabricated evidence, falsified investigative records, and material omissions described above, Plaintiff suffered unlawful arrest, a criminal prosecution that remained pending for approximately three months, reputational harm, financial injury, career damage, and emotional distress. (¶82, ¶118, ¶159, ¶161, ¶¶177–180, ¶186, ¶188, ¶191, ¶192, ¶¶194–201)

**COUNT 8**

**Fourth Amendment Violation – Malicious Prosecution (42 U.S.C. § 1983)**

Defendants: Corporal Kodi Pizelli and Deputy Chris Frame (Individual Capacities)

285. Plaintiff incorporates ¶¶24, 70, 76–78, 87, 109–115, 119, 130–134, 149, 153, 159–161, 175, 180–184, and 225 as if fully restated.

286. The Fourth Amendment protects citizens from being subjected to a criminal prosecution initiated and maintained without probable cause. Under Sykes v. Anderson, 625 F.3d 294 (6th Cir. 2010), a malicious prosecution claim requires: (1) that an officer made, influenced, or participated in the decision to prosecute; (2) a lack of probable cause for the prosecution; (3) a deprivation of liberty apart from the initial seizure; and (4) a favorable termination of the criminal proceeding. Each element is satisfied here.

287. Participation in the Decision to Prosecute: Corporal Pizelli directly influenced and participated in the decision to initiate and upgrade the criminal charge through two affirmative acts. First, after viewing exculpatory video footage at the scene—recordings that showed Plaintiff standing on her own property with the firearm pointed downward and not entering the roadway—Corporal Pizelli characterized the footage in his official report and communications as "incriminating," asserting that Plaintiff had "recorded herself" committing the charged offense. That false characterization was transmitted to the prosecutor and formed part of the factual basis for the criminal complaint. Second, Corporal Pizelli approached Tracie Crockrel at the Lawrence County Jail and explicitly solicited a written statement "to show the court this is an ongoing problem." This solicitation occurred despite Crockrel's sworn testimony, given only days earlier, that

Plaintiff had never threatened her and had never entered her property. (¶¶76–78, 87, 109–115, 159–160) The solicited statement was used to upgrade the charge from Menacing to Aggravated Menacing. Under Sykes, an officer who includes deliberate or reckless falsehoods in investigatory materials knowing a prosecutor will rely on them is liable for malicious prosecution.

288. Lack of Probable Cause: Neither Corporal Pizelli nor Deputy Frame had probable cause to initiate or sustain the prosecution. Before Plaintiff's arrest and before the formal complaint was filed, Corporal Pizelli viewed video from Plaintiff's security camera and cell phone that directly contradicted the complaining witnesses' allegations and showed Plaintiff on her own property, firearm pointed downward, not entering the roadway. Rather than reconcile that footage with the witness accusations, Corporal Pizelli concealed its exculpatory character and relied instead on the uncorroborated statements of hostile neighbors whose accounts the video directly refuted. Reliance on demonstrably unreliable witnesses while ignoring readily available exculpatory evidence destroyed any basis for probable cause. (¶¶70, 76–78, 87, 159, 225)

289. Prolonged Prosecution Through Retention of Plaintiff's Phone: Corporal Pizelli further prolonged the prosecution by seizing Plaintiff's cellular phone on March 15, 2024, and retaining it in law enforcement custody for 103 days—more than four weeks beyond a court order directing its return. The phone contained the same video footage Corporal Pizelli had falsely characterized as incriminating. Its prolonged retention prevented the

objective, exculpatory evidence from being independently reviewed by the prosecutor or the court during the pendency of the case. (¶¶87, 131–134, 159–161, 180–184)

290. Deprivation of Liberty Apart from the Initial Seizure. The prosecution imposed a deprivation of liberty extending well beyond the initial nine-hour custodial detention. The pending charge subjected Plaintiff to ongoing pretrial restrictions including mandatory travel limitations (¶¶149, 153, and 175) and required fingerprinting. The prosecutor's office further directed Plaintiff to obtain housing outside her neighborhood for the duration of the proceedings — an instruction Plaintiff was compelled to follow, requiring her to rent a separate apartment in Kentucky and vacating her from her own 31-acre property for the entirety of the case. (¶¶24, 153, 175)

291. Favorable Termination. The criminal proceeding was resolved in Plaintiff's favor when the Aggravated Menacing charge was dismissed and expunged on June 27, 2024—the day after Plaintiff regained access to her phone and the exculpatory footage became available to the court. (¶¶130, 180, 182, 184)

292. Damages. As a direct and proximate result of Corporal Pizelli's and Deputy Frame's malicious prosecution, Plaintiff suffered a prolonged deprivation of liberty, including nine hours of custodial detention, mandatory pretrial restrictions, and forced displacement from her residence. Plaintiff further suffered reputational harm, severe emotional distress, the forced sale of her 31-acre property, the loss of her 2.8% mortgage interest rate, termination of her employment at Microsoft, and between $40,000 and $50,000 in credit

card debt incurred as a direct result of the financial devastation that followed. (¶119, ¶149, ¶153, ¶177, ¶188, ¶191, ¶194, ¶195, ¶198, ¶200)

**COUNT 9**

**Fourteenth Amendment Violation – Equal Protection (Selective Enforcement / Class-of-One) (42 U.S.C. § 1983)**

Defendants: Corporal Kodi Pizelli, Deputy Chris Frame, Chief Deputy Michael Gore, and Sheriff Jeff Lawless (Individual Capacities)

293. Plaintiff incorporates ¶¶33–34, 38, 42–47, 49, 54–56, 69–71, 76, 78, 81, 88–91, 94–95, 100–101, 106, 130, 138–139, 149, 151, 153, 161, 175, 179–180, 183, 186, 191, 194–195, and 225 as if fully restated.

294. The Equal Protection Clause of the Fourteenth Amendment prohibits law enforcement officers from intentionally treating a person differently than similarly situated persons through selective enforcement of the law without a rational basis — including by refusing enforcement against a documented aggressor while simultaneously subjecting the victim to punitive arrest. A class-of-one claim does not require membership in a protected class; it requires only that the plaintiff was singled out for arbitrary, irrational treatment with no legitimate justification.

295. On March 15, 2024, Corporal Pizelli and Deputy Frame executed a custodial arrest of Plaintiff based on unverified accusations from Plaintiff's neighbors, without taking any enforcement action against Bobby Corbin — a neighbor who had made recorded death threats against Plaintiff and was subject to an active court-issued Civil Stalking Protection Order protecting Plaintiff. (¶¶34, 49, 54, 69–70, 88, 225)

296. Before and during that same encounter, Plaintiff informed Corporal Pizelli and Deputy Frame that Bobby Corbin had threatened to murder her and that she held an active court-issued protection order against him, stating directly: "The guy who threatened to murder me... I have a protection order from him." Plaintiff also showed Corporal Pizelli videos depicting the organized stalking and harassment directed at her property. (¶¶76, 81, 88–91)

297. During the same encounter, Corporal Pizelli explicitly told Plaintiff: "No, I'm filing a report for you" — directly acknowledging Plaintiff as a victim with a legitimate complaint requiring documentation. Notwithstanding this acknowledgment, Corporal Pizelli proceeded to arrest Plaintiff and took no enforcement action against Corbin, the subject of Plaintiff's complaint. (¶¶54, 88–89, 94–95)

298. Plaintiff further told Corporal Pizelli that she had repeatedly attempted to obtain enforcement and protection through the Sheriff's Office and stated directly: "I don't wanna talk to anyone, sir... I will only talk to FBI, sir... Because your department is in it! And the sheriff is in it!" — placing both officers on contemporaneous notice that Plaintiff

believed the Sheriff's Office was complicit in the ongoing failure to protect her. (¶¶33–34, 38, 43, 55, 71)

299. Despite receiving: (a) Plaintiff's direct statement that Corbin had threatened to murder her and that she held an active protection order against him; (b) video evidence of the harassment shown at the scene; and (c) Corporal Pizelli's own acknowledgment that Plaintiff was a victim warranting a report — Corporal Pizelli and Deputy Frame arrested Plaintiff while taking no enforcement action against Corbin and making no inquiry into the reported violations. (¶¶54, 76, 88–89, 91, 94–95, 225)

300. During the same encounter, at approximately 11:30 a.m., while Plaintiff was detained in the patrol vehicle, Corporal Pizelli placed a telephone call to Chief Deputy Michael Gore. At approximately 11:33 a.m., Corporal Pizelli identified Cindy Isgett by name to Gore while Plaintiff remained detained. Chief Deputy Gore was personally informed in real time of the parties involved and, having been actively consulted during the arrest, approved and ratified the differential enforcement being applied against Plaintiff while no action was taken against Corbin. (¶¶ 54, 100–101, 106)

301. In the weeks and months preceding March 15, 2024, Plaintiff made multiple documented reports to the Lawrence County Sheriff's Office seeking enforcement and protection regarding Corbin's death threats and protection-order violations. On January 30, 2024, the Lawrence County Prosecutor's Office informed Plaintiff that her evidence

file could not be transmitted for prosecution without Sheriff Lawless's personal review and approval, and that the file was likely "still sitting on his desk." (¶¶34, 38, 42, 55)

302. On February 7, 2024, Plaintiff called the Sheriff's Office and specifically demanded to speak with Sheriff Lawless directly, stating: "I don't need to talk to any deputy. I really need to talk to the sheriff." The dispatcher stated: "I will put this in his box." Sheriff Lawless did not return Plaintiff's call and took no enforcement action. (¶¶43, 45–47, 54)

303. On February 29, 2024 — two weeks before Plaintiff's arrest — a Lawrence County Sheriff's Office deputy responded to Plaintiff's report that Corbin was actively violating the Protection Order within the prohibited 500-foot zone, refused to intervene, stating "there's nothing I can do on a public roadway," and filed a report (Case No. 24S-00960) without taking enforcement action. Sheriff Lawless took no remedial action following that report. (¶¶54–56, 69)

304. Bobby Corbin is an appropriate and direct comparator for selective enforcement. Corbin's recorded conduct — threatening to kill Plaintiff, stating she was "going to the ground," and directing death threats at her on video — constitutes Aggravated Menacing under Ohio law: the identical charge brought against Plaintiff the following day. Corporal Pizelli and Deputy Frame received direct oral notice on March 15, 2024 that Corbin had threatened to murder Plaintiff and that she held an active court-issued protection order against him. Despite that notice, and despite the existence of recorded evidence establishing Corbin's commission of the same offense with which Plaintiff was charged,

neither officer arrested Corbin, filed charges, or made any inquiry into the reported violations. By contrast, both officers relied on unverified neighbor accusations — while actively disregarding Plaintiff's exculpatory video evidence — to arrest Plaintiff, charge her with Aggravated Menacing, and initiate a prosecution that lasted 103 days. Corbin faced no arrest, no charge, and no prosecution. This identical-offense, opposite-outcome disparity cannot be explained by the strength of the evidence and constitutes the paradigmatic case of intentional, arbitrary selective enforcement without any rational basis. (¶¶ 34, 54, 70, 76, 78, 88–89, 130, 180, 183)

305. Corporal Pizelli's and Deputy Frame's differential enforcement on March 15, 2024 was intentional, arbitrary, and lacked any rational basis. Chief Deputy Gore's real-time participation in and approval of that differential enforcement renders him directly liable for the same constitutional violation. Sheriff Lawless's personal retention of Plaintiff's evidence file without action, his failure to respond to Plaintiff's direct requests, and the sustained pattern of non-enforcement by officers under his command — while punitive enforcement was simultaneously applied against Plaintiff — collectively demonstrate a deliberate and ongoing deprivation of equal police protection.

306. Damages: As a direct and proximate result of this selective enforcement and unequal police protection, Plaintiff suffered an unlawful arrest, a 103-day criminal prosecution, continued exposure to Corbin's threats and protection-order violations without intervention, forced displacement from her home, and severe emotional trauma. (¶¶54–

56, ¶82, ¶¶138–139, ¶149, ¶151, ¶153, ¶161, ¶175, ¶179, ¶180, ¶183, ¶186, ¶191, ¶194, ¶195)

## COUNT 10

### Fourteenth Amendment Violation – Equal Protection (Discriminatory Treatment Based on National Origin) (42 U.S.C. § 1983)

Defendants: Corporal Kodi Pizelli, Deputy Chris Frame, Chief Deputy Michael Gore, and Sheriff Jeff Lawless (Individual Capacities)

307. Plaintiff incorporates ¶¶27, 29–30, 34, 37–38, 41–43, 45–47, 54–56, 69–70, 76–78, 81, 88–89, 100–101, 109, 111–115, 117, 119, 138–139, 186–187, 191, and 194 as if fully restated.

308. The Equal Protection Clause of the Fourteenth Amendment prohibits law enforcement officers from intentionally providing unequal police protection, unequal investigative services, or unequal enforcement of the law because of a person's national origin or perceived ethnicity.

309. In the months preceding March 15, 2024, Plaintiff made multiple documented reports to the Lawrence County Sheriff's Office seeking enforcement and protection regarding Bobby Corbin's recorded death threats, protection-order violations, and national-origin

harassment. Corbin's conduct was documented on video, in which he called Plaintiff a "Russian whore," stated that Plaintiff "do nothing but rip off people, scam people" and threatened that Plaintiff was "going to the ground." Separately, Tracie Crockrel — in a text message to Plaintiff — stated that "nobody in this holler likes you" and told Plaintiff to "take your ass back to Russia." (¶¶29, 34, 38, 55)

310. On January 23, 2024, Deputy DeLawder falsely assured Plaintiff that her felony hate-crime report (Case No. 23S-5590) documenting Corbin's death threats had been "sent over and signed for on 12/28/23." On January 30, 2024, the Lawrence County Prosecutor's Office informed Plaintiff that it had no record of the case, and that the evidence could not be transmitted for prosecution without Sheriff Lawless's personal review and approval — the file was likely "still sitting on his desk." (¶¶34, 37, 41, 42)

311. On February 7, 2024, Plaintiff called the Sheriff's Office and specifically demanded to speak with Sheriff Lawless directly, stating: "I don't need to talk to any deputy. I really need to talk to the sheriff." Plaintiff described "death threats... based on my ethnic... national origin," identified Corbin as the source, and stated she had filed a report. The dispatcher stated: "I will put this in his box." Sheriff Lawless did not return Plaintiff's call and took no enforcement action. (¶¶34, 43–47, 54)

312. On March 15, 2024, prior to and during the encounter that culminated in Plaintiff's arrest, Plaintiff informed Corporal Pizelli and Deputy Frame that she was the victim of bias-motivated threats and intimidation tied to her national origin and Russian accent.

Plaintiff identified Bobby Corbin as the aggressor, reported that Corbin targeted her with death threats explicitly because she was not born in the United States, and stated that his conduct constituted ethnic intimidation and a hate crime directed at her based on her national origin. (¶¶69, 81, 88–89)

313. Corporal Pizelli and Deputy Frame took no enforcement action against Corbin, made no inquiry into the reported national-origin–based threats, and instead relied on unverified neighbor accusations to treat Plaintiff as the offender and arrest her — notwithstanding Plaintiff's contrary video evidence. Corbin, who had made recorded death threats against Plaintiff on the basis of her national origin, faced no arrest, no charge, and no inquiry. (¶¶34, 54, 70, 76–78, 88–89)

314. The discriminatory enforcement pattern is further explained by the personal relationships connecting the officials who approved the differential enforcement to the individuals engaged in the harassment campaign against Plaintiff. Cindy Isgett — whom Corporal Pizelli personally identified by name to Chief Deputy Gore during the arrest call — was a close personal friend of Tracie Crockrel and Bobby Corbin. (¶¶30, 100, 101) Chief Deputy Michael Gore and Cindy Isgett were former colleagues at the Ohio State Highway Patrol. Cindy Isgett's late husband, Paul Isgett, was also an Ohio State Highway Patrol officer and maintained a documented Facebook connection with Gore. Sheriff Jeff Lawless and Gore have likewise described themselves as longtime personal friends, as Gore publicly stated in the Ohio State Highway Patrol's official magazine Flying Wheel (Vol. 63, No. 2, April–June 2025). The Lawless family maintained a direct personal

friendship with Isgett: a publicly available Facebook post dated May 18, 2020, by Lana Lawless — Sheriff Lawless's wife — tagged both Sheriff Jeff Lawless and Cindy Isgett by name, stating "One pool up and one to go!" Isgett responded in friendly conversation, commenting "Making progress!" Deputy Michael DeLawder commented on the same post.

315. The individuals protected from enforcement and the officials who provided that protection were thus members of the same personal network, while Plaintiff — the "outsider" who reported crimes committed by that network — was arrested and subjected to upgraded charges based on unverified neighbor accusations. (¶¶27, 70, 109, 111–115)

316. The discriminatory enforcement pattern is further explained by the personal relationships connecting the officials who approved the differential enforcement to the individuals engaged in the harassment campaign against Plaintiff. (¶314) Cindy Isgett — whom Corporal Pizelli personally identified by name to Chief Deputy Gore during the arrest (¶¶100, 101) — was a close personal friend of Tracie Crockrel (¶30), whose unverified accusations were used to upgrade the charges against Plaintiff. (¶¶109, 111–115).

317. The individuals protected from enforcement and the officials who provided that protection were thus members of the same personal network, while Plaintiff — the outsider who reported crimes committed by that network — was arrested.

318. The convergence of these relationships directly explains the pattern of inaction against Corbin and enforcement against Plaintiff: Sheriff Lawless personally retained Plaintiff's felony hate-crime report on his desk without action and Chief Deputy Gore — Isgett's colleague — approved the arrest of Plaintiff in real time while Corbin, a close associate of Isgett, faced no consequences. The Sheriff's Office protected the social circle of its own officials while criminalizing Plaintiff, the outsider who had reported crimes committed by that circle. (¶25, ¶27, ¶30, ¶34, ¶¶40–42, ¶¶54–56, ¶¶100–101, ¶314)

319. The disparate treatment of Plaintiff in the provision of police protection and enforcement — disregarding Plaintiff's reported national-origin-based death threats and documented violations by Corbin while arresting Plaintiff — was intentional and motivated by Plaintiff's national origin and perceived ethnicity, compounded by insider loyalty to the personal social circle engaged in the campaign against Plaintiff, depriving Plaintiff of equal protection of the laws.

320. Damages: As a direct and proximate result of this discriminatory treatment, Plaintiff suffered deprivation of liberty, exposure to continued ethnic intimidation and threats, loss of police protection, severe emotional distress and psychological trauma, and denial of equal protection. (¶34, ¶¶54–56, ¶117, ¶119, ¶¶138–139, ¶¶186–187, ¶191, ¶194)

**COUNT 11**

**Fourteenth Amendment Violation – State-Created Danger (Solicitation of Retaliatory Protection Order) (42 U.S.C. § 1983)**

Defendant: Corporal Kodi Pizelli (Individual Capacity)

321. Plaintiff incorporates ¶¶34, 37, 48–61, 69, 76–78, 88–89, 109–115, 138–139, 151, 161, 182, 191, and 193–194 as if fully restated.

322. The Due Process Clause of the Fourteenth Amendment is violated under the state-created danger doctrine when state actors take affirmative steps that create or substantially increase a specific and foreseeable risk of private harm, and act with deliberate indifference under circumstances that shock the conscience.

323. On December 28, 2023, Plaintiff petitioned the Lawrence County Court of Common Pleas for Civil Stalking Protection Orders against both Bobby Corbin (Case No. 23 OC 859) and Tracie Crockrel (Case No. 23 OC 860). The Court granted an ex parte Civil Stalking Protection Order against Corbin but denied an ex parte order against Crockrel, despite Plaintiff submitting evidence that Crockrel threatened to "take matters into her own hands" and that Crockrel's children entered Plaintiff's property and were recorded on video striking Plaintiff's security camera and opening Plaintiff's mailbox. (¶¶48–51)

324. On February 29, 2024, Plaintiff contacted the Sheriff's Office to report that Corbin was violating the active protection order by repeatedly riding a dirt bike past Plaintiff's house

within the prohibited 500-foot zone on a dead-end road, even though he lived closer to the highway and could have traveled in the opposite direction without passing Plaintiff's residence. A responding officer refused to intervene, stating: "there's nothing I can do on a public roadway," but filed a report for the Prosecutor's Office. (¶¶55–56)

325. On March 11, 2024, a full hearing was held on Tracie Crockrel's petition for a Civil Stalking Protection Order against Plaintiff (Case No. 24-OC-92). During the hearing, Crockrel admitted under oath that she included her boyfriend, Bobby Corbin, as a protected party and acknowledged she was aware a protection order was already in effect against Corbin for Plaintiff's protection at the time she filed. (¶¶57–58)

326. During the same hearing, Crockrel admitted facts demonstrating the absence of a firearm threat by Plaintiff and the retaliatory nature of her allegations — including admissions that Plaintiff had never put a gun in her face and said she would shoot; that she was not the target and did not know what Plaintiff was shooting at; that Plaintiff never came onto her property; and that Plaintiff never threatened to shoot her on her property. Crockrel further agreed that "talk is just talk," and clarified that a text message she relied upon as a "threat" actually instructed her not to approach Plaintiff. (¶¶59–61)

327. Four days later, on March 15, 2024, Corporal Pizelli took an affirmative step that materially altered Plaintiff's legal position: upon encountering Tracie Crockrel at the Lawrence County Jail, Corporal Pizelli solicited Crockrel to provide a written statement regarding Plaintiff's "violent behavior towards neighbors" to be "added to this incident

report," explicitly stating he needed it "to show the court this is an ongoing problem." (¶¶109–111) This act created a state-backed "ongoing problem" narrative designed to justify escalating enforcement against Plaintiff — the victim — rather than against her aggressors, and furnished a factual basis for the civil protection order proceedings that were still pending. As a result, a retaliatory civil protection order was sought against Plaintiff that included Bobby Corbin as a protected party. (¶115)

328. This state-solicited retaliatory order created a legal trap by criminalizing Plaintiff's ability to record Corbin — stripping Plaintiff of the primary means she used to document Corbin's threats and protection-order violations. A civil protection order was subsequently granted against Plaintiff that included Bobby Corbin as a protected party and prohibited Plaintiff from videotaping Crockrel, Crockrel's children, and Corbin, materially increasing Plaintiff's vulnerability to further harassment and threats. (¶¶115, 151)

329. The manufactured character of the solicited evidence is reflected in Crockrel's own written statement, which directly contradicts Corporal Pizelli's account of how and why she was at the jail. Corporal Pizelli's report states that Crockrel was "being booked into jail" for an unrelated matter. (¶110) Crockrel's own written statement, however, opens: "Marina Drus has entered the jail. I had just went to court trying to apply a protection order against her," and concludes: "I have turned my evidence to D.L. McWhorter's court." (¶112) These statements describe Crockrel as present at the jail and then released — free to go to court to file a report against the plaintiff. The statement indicates that

Tracie was freely entering the jail, observing the plaintiff, and freely exiting to go to court, or alternatively, that she was transported to court in a police car. The discrepancy between Corporal Pizelli's account of how the encounter arose and Crockrel's own description of why she was there further undermines the integrity of the solicited statement and the circumstances under which it was obtained. Notably, the date and time fields on Crockrel's statement form were left entirely blank — unlike every other witness statement collected that day, each of which bore a completed date and time of execution.

330. The manufactured character of that evidence was compounded by Crockrel's documented lack of credibility: public court records reflect that Crockrel had prior misdemeanor convictions including Assault (M1), Domestic Violence (M1), and three counts of Child Endangering (M1), while Plaintiff has no criminal history. (¶114) Notwithstanding these documented credibility concerns, Corporal Pizelli relied on Crockrel's statement rather than on the objective video evidence Plaintiff had shown him at the scene and Plaintiff's unblemished record. (¶¶76–78, 115)

331. Corporal Pizelli's reliance on that statement as the basis for upgrading the criminal charge from Menacing to Aggravated Menacing — and for constructing an "ongoing problem" narrative to justify escalation against Plaintiff — constituted deliberate indifference, because the statement directly contradicted Crockrel's own sworn testimony given only four days earlier at the March 11, 2024 hearing, at which she had testified under oath that Plaintiff had never threatened her with violence and had never entered her property. (¶¶57, 59–60, 109, 113) Despite this direct sworn contradiction, Corporal

Pizelli elevated the manufactured statement to justify the upgraded charge against Plaintiff and the solicitation of a retaliatory protection order. (¶115)

332. The danger created by Corporal Pizelli's affirmative acts was specific and foreseeable. At the time Corporal Pizelli solicited Crockrel's statement, Corporal Pizelli knew or should have known: (a) that Bobby Corbin was documented on video calling Plaintiff a "Russian whore," stating she was "going to the ground," and swearing to murder her, and that the Sheriff's Office had received and documented Plaintiff's felony hate-crime report (Case No. 23S-5590) based on that evidence (¶¶34, 37); (b) that a Civil Stalking Protection Order was already in effect against Corbin for Plaintiff's protection, establishing official judicial recognition of the danger Corbin posed (¶49); (c) that Corbin had violated the protection order on February 29, 2024, and that a responding officer had declined to intervene — demonstrating that existing protections had already failed to deter him (¶¶55–56); (d) that Crockrel and Corbin were in a domestic relationship, meaning that adding Corbin as a protected party under Crockrel's retaliatory order would neutralize the existing protection order by criminalizing Plaintiff's ability to record the very individual who had sworn to murder her (¶¶58, 115, 151); (e) that Plaintiff had directly informed Corporal Pizelli at the scene that Corbin had threatened to murder her, that she held an active court-issued protection order against him, and that civil protection order proceedings involving Corbin were ongoing before Judge McWhorter — information that, taken together with Crockrel and Corbin's domestic relationship, placed Corporal Pizelli on notice that soliciting a statement from Crockrel to include Corbin as a protected party would expose Plaintiff to further danger from the very individual she had

just identified as a would-be killer (¶¶88–89); (f) that Crockrel's criminal history made her a particularly unreliable foundation upon which to strip Plaintiff of her primary means of self-protection (¶114); and (g) that Bobby Corbin had an extensive criminal history of violence reflected in public court records, including four separate charges of Domestic Violence (M1) in 2010, 2011, 2020, and 2022 — three of which were filed by the Lawrence County Sheriff's Office itself — Aggravated Menacing (M1) in 2013, a prior Violation of a Protection Order (M1) in 2013, Assault (M1) in 2018, Telephone Harassment (M1) in 2008, and three counts of Child Endangering (M1) in 2022 also filed by the Sheriff's Office. The Sheriff's Office had direct institutional knowledge of Corbin's pattern of violence: its own officers had filed multiple charges against him, and his 2013 protection-order violation demonstrated that Corbin had previously defied court orders without meaningful consequence.

333. The danger was particularized to Plaintiff as distinguished from the public at large: the retaliatory protection order specifically targeted Plaintiff's protective mechanisms by criminalizing her ability to record the specific individual who had sworn to murder her, and Corporal Pizelli's solicitation was directed specifically at constructing a narrative against Plaintiff — not at any general public safety concern.

334. Corporal Pizelli's conduct, viewed in its totality, shocks the conscience. With full knowledge that Corbin had sworn to murder Plaintiff, that he had violated the existing protection order without enforcement consequence, and that Crockrel's own sworn testimony given four days earlier directly contradicted the statement he solicited from

her, Corporal Pizelli nonetheless manufactured a narrative to strip Plaintiff of her primary means of self-protection and arm her documented would-be killer with a state-backed instrument of impunity. This was not negligence or inadvertence — it was a deliberate course of conduct that placed Plaintiff in foreseeable mortal danger for the purpose of constructing a case against the victim rather than her aggressors.

335. Following the arrest, Corbin repeatedly violated the active Civil Stalking Protection Order by passing Plaintiff's property within the prohibited distance multiple times — both on foot and in his vehicle — and on multiple occasions spoke directly toward Plaintiff's residence in a taunting and mocking manner demonstrating awareness that law enforcement would not intervene. (¶¶138–139)

336. This escalation was a foreseeable consequence of Corporal Pizelli's affirmative acts: by arming Corbin with a state-supported retaliatory order and stripping Plaintiff of her primary means of documenting violations, Corporal Pizelli emboldened Corbin to intensify his harassment and stalking with reduced fear of enforcement consequences.

337. Damages: As a direct and proximate result of Corporal Pizelli's solicitation and weaponization of a retaliatory protection order and the increased vulnerability created thereby, Plaintiff suffered heightened danger, continued stalking and harassment by a known violent aggressor, and severe emotional distress. For approximately three and a half months — from the date of arrest on March 15, 2024 through the dismissal of criminal charges on June 27, 2024 — Plaintiff lived in sustained fear for her life,

knowing that the individual who had sworn to murder her had been emboldened by state action and that Corporal Pizelli had deliberately stripped her of the means to protect herself through documentation. These damages include all related harms as alleged elsewhere in the Complaint. (¶34, ¶69, ¶¶110–111, ¶115, ¶¶138–139, ¶151, ¶161, ¶182, ¶191, ¶193, ¶194)

**COUNT 12**

**Fourteenth Amendment Violation – State-Created Danger (42 U.S.C. § 1983)**

Defendants: Sheriff Jeff Lawless; Chief Deputy Michael Gore; Corporal Kodi Pizelli; Deputy Chris Frame (Individual Capacities)

338. Plaintiff incorporates ¶¶ 25, 27–31, 33–34, 37, 42–43, 47, 49, 63, 76–78, 82, 84–85, 88–90, 93, 97, 99, 100–104, 108, 125, 129, 138–139, 142–145, 147–149, 151–152, 154–157, 159, 179, 186, 189, 191, 193–196, and 314 as if fully restated.

339. The Due Process Clause of the Fourteenth Amendment is violated under the state-created danger doctrine when state actors take affirmative steps that create or substantially increase a specific and foreseeable risk of private harm, and act with deliberate indifference under circumstances that shock the conscience.

340. At the time of Plaintiff's arrest, a neighborhood coalition — including Cindy Isgett, Tracie Crockrel, Bobby Corbin, Milton Depriest, and the Long family — had been engaged in a coordinated campaign of harassment, stalking, and ethnic intimidation against Plaintiff, including documented death threats by Corbin recorded on video. (¶¶28–31, 34, 90) Plaintiff had repeatedly reported this campaign to the Sheriff's Office and held an active court-issued protection order against Corbin. (¶¶33, 37, 49, 88–89)

341. The coordination between the Sheriff's Office and that coalition was not incidental. (¶314, ¶¶100–101) Chief Deputy Michael Gore and Cindy Isgett were former colleagues at the Ohio State Highway Patrol. Cindy Isgett's late husband, Paul Isgett, was also an Ohio State Highway Patrol officer and maintained a documented Facebook connection with Gore. Sheriff Jeff Lawless and Gore have likewise described themselves as longtime personal friends. The Lawless family also maintained a direct personal friendship with Isgett, as reflected in a publicly available Facebook post dated May 18, 2020, by Lana Lawless — Sheriff Lawless's wife — which tagged both Sheriff Jeff Lawless and Cindy Isgett by name. These overlapping professional and personal relationships between the Sheriff's Office command staff and a member of the coalition targeting Plaintiff provided context for the events that followed. (¶¶ 30)

342. Before the arrest, Sheriff Lawless failed to forward Plaintiff's felony hate-crime report (Case No. 23S-5590) — documenting Corbin's recorded death threats — to the Prosecutor's Office, and Deputy DeLawder falsely assured Plaintiff the report had been transmitted when it had not. (¶¶34, 37, 41–42) Sheriff Lawless refused to return

Plaintiff's call reporting those threats. (¶¶43–47) Chief Deputy Gore, the direct superior of the responding deputies and a former Ohio State Highway Patrol colleague of Cindy Isgett, was positioned to direct the response to Plaintiff's reports and took no corrective action. Three days before the arrest, a Sheriff's Office dispatcher told Plaintiff she could move rather than receive protection. These acts demonstrate that the command structure was actively shielding the coalition while leaving Plaintiff without protection.

343. On February 20, 2024, approximately twenty-three days before the arrest, a Lawrence County Sheriff's Office vehicle — dispatched under the authority of Sheriff Lawless and Chief Deputy Gore — traveled to Township Road 208, stopped across from Plaintiff's sign near Isgett's property, proceeded to the dead end, remained approximately ten minutes, and returned. No report was generated and no officer contacted Plaintiff. This unrecorded visit established pre-arrest familiarity with the coalition's neighborhood and laid the groundwork for the coordination on March 15.

344. During the March 15, 2024 arrest, while Plaintiff was already detained, Corporal Pizelli called Chief Deputy Gore and identified Cindy Isgett by name before any formal witness contact had occurred. (¶¶100–101) Chief Deputy Gore received that identification and approved Pizelli's continued course of action — including the coordination with Isgett — without directing any scrutiny of Isgett's relationship to the coalition or the pending protection order proceedings. Corporal Pizelli then falsified the investigative record, claiming he did not know Isgett and that she had merely "waved him down" as a concerned neighbor. (¶102) Security camera footage disproves this: Corporal Pizelli

drove toward the dead end near Isgett's property at approximately 11:41 a.m. and returned past it at 11:47 a.m. without stopping. (¶¶103–104) By falsifying the record, Corporal Pizelli converted a coordinated insider into an officially credentialed neutral bystander, affirmatively empowering Isgett to continue acting against Plaintiff without accountability.

345. Deputy Frame and Corporal Pizelli physically executed the arrest of Plaintiff — placing her in handcuffs and carrying her to the patrol vehicle — without probable cause, on the direction of Corporal Pizelli, converting the documented victim of the neighborhood coalition into the subject of official law enforcement action. (¶82) While Plaintiff was detained, Deputy Frame and Corporal Pizelli further permitted Milton Depriest — a neighbor who had been stalking Plaintiff's property — to remain on Plaintiff's private property, observe the arrest, and interact with the arresting officers in a friendly and familiar manner, without taking any action to remove him. (¶¶90, 93, 97) The arrest itself, and Depriest's unchallenged participation in it, together signaled to the coalition that law enforcement had aligned itself with their campaign and that their aggressors would face no consequences.

346. Corporal Pizelli seized Plaintiff's cellular phone — containing exculpatory video evidence Plaintiff had shown officers at the scene — directly from Plaintiff's hands while she was on an active call. (¶¶76, 84) This seizure stripped Plaintiff of her primary means of proving her innocence. After seizing the device, Corporal Pizelli, while in possession of Plaintiff's phone, proceeded in the direction of the dead end where Michael Long

resided and past the property where Cindy Isgett was located, while Deputy Frame proceeded toward the highway to transport Plaintiff to the police precinct. (¶¶85, 99, 103) This transport of Plaintiff's exculpatory evidence toward the properties of Plaintiff's hostile neighbors, rather than securing it as evidence, constituted an affirmative act that further compromised Plaintiff's security and signaled alignment with the private actors.

347. Corporal Pizelli adopted the coalition's fabricated narrative of dangerousness as official state action — relying on coordinated false statements from hostile witnesses while ignoring the exculpatory video Plaintiff had shown him — and converted that private narrative into an arrest, criminal charges, and a falsified investigative record. (¶¶78, 102, 159) Chief Deputy Gore approved Pizelli's actions during the arrest. (¶¶100–101) Sheriff Lawless, as the head of the agency, bears supervisory responsibility for the pattern of conduct that began with his failure to forward Plaintiff's felony report and culminated in the arrest of the documented victim rather than her aggressors. (¶42)

348. The danger created by these affirmative acts was specific, particularized, and foreseeable. Sheriff Lawless and Chief Deputy Gore knew of Corbin's documented death threats, of Plaintiff's active protection order, and of the coalition's ongoing harassment campaign from Plaintiff's prior reports. (¶¶34, 42, 49) Corporal Pizelli and Deputy Frame were warned by Plaintiff at the scene that the neighbors present had previously threatened her life. (¶¶88–89) The resulting danger was directed at Plaintiff individually — not the public generally — because the coalition's campaign targeted her specifically due to her national origin and outsider status on a dead-end road. (¶¶25, 27, 63)

349. The state-created danger was immediately felt by Plaintiff while in custody. Plaintiff observed officers interacting with Milton Depriest and other hostile neighbors in a friendly and familiar manner — the same individuals who had previously threatened her life. (¶¶88–89, 97) Based on the cumulative weight of these observations — officers who refused to protect her from documented threats, who appeared to coordinate with the individuals threatening her, and who were now visibly aligned with her harassers at the arrest scene — Plaintiff experienced genuine terror for her physical safety and begged Deputy Frame not to murder her. (¶¶47, 56, 100–101)

350. The emboldening effect was immediate and sustained. Following the arrest, Corbin repeatedly violated the active Civil Stalking Protection Order by passing Plaintiff's property within the prohibited distance on foot and by vehicle, and approaching the residence to taunt her directly. (¶¶138–139) Cindy Isgett — a close personal friend of both Tracie Crockrel and Bobby Corbin — joined in this campaign, repeatedly stopping near Plaintiff's property to watch her. (¶¶30, 144) Individuals associated with Isgett approached Plaintiff's security cameras and directed verbal insults toward Plaintiff into the cameras. (¶145) Michael Long struck Plaintiff's mailbox with his truck while passing her property. (¶142) S.L. repeatedly drove slowly past the residence, shouting toward the property through a handheld amplification device. (¶143) Township Road 208, a dead-end road that ordinarily saw approximately one vehicle every two to three hours, was suddenly flooded with unknown trucks and cars passing approximately every ten minutes, slowing near Plaintiff's property despite the road serving only a handful of

residences. (¶147) Plaintiff was further subjected to sustained nighttime stalking by trucks slowly driving back and forth within her property on Township Road 208, clearly surveilling her. (¶148) On March 16, 2024 — the morning immediately following Plaintiff's arrest — a Lawrence County Sheriff's Office vehicle passed Plaintiff's residence and returned minutes later. No officer contacted Plaintiff and no report was generated. Upon observing the vehicle, Plaintiff experienced immediate fear that officers had returned to take her back to jail. This post-arrest visit reinforced Plaintiff's state of terror and signaled to the neighborhood coalition that state engagement against Plaintiff was continuing. This manufactured surveillance rendered Plaintiff effectively imprisoned on her own property — unable to safely exit, unable to document violations, and unable to seek help. Because the only route out passed directly by the residences of Corbin and Crockrel — and because a court order prohibited Plaintiff from video-recording either of them — she had no safe passage and no means of self-protection. (¶¶151–152) Over the following three and a half months, Plaintiff was forced to travel only between approximately 11:00 p.m. and 3:00 a.m. or take a cab. (¶149) On Plaintiff's final day at the residence, Isgett attempted to interpose her vehicle between Plaintiff and a moving truck. Plaintiff told the movers she would not arrive at the storage facility alive if Isgett passed between them. at Plaintiff's request, the driver stopped the moving truck and did not allow Isgett to cut between them, ensuring Plaintiff remained directly behind the moving vehicle. Isgett then followed Plaintiff and the moving truck for several miles, as documented by dash camera footage. (¶¶154–157) Plaintiff was ultimately forced to vacate her home. (¶¶179, 195)

351. Sheriff Lawless, Chief Deputy Gore, Corporal Pizelli, and Deputy Frame each acted with deliberate indifference. Sheriff Lawless and Chief Deputy Gore — personally connected to Isgett and possessing full knowledge of Corbin's documented death threats — shielded the coalition through inaction and supervisory approval of the arrest. (¶¶34, 42, 47, 100–101) Corporal Pizelli — with Plaintiff's direct warning at the scene of Corbin's murder threats and the active protection order — falsified the record to empower Isgett and her friends and stripped Plaintiff of her means of self-protection. (¶¶84, 88–89, 102) Deputy Frame permitted a coalition member to participate in the arrest scene unchallenged. (¶¶93, 97) This collective course of conduct, which converted the documented victim into the target of official state action and armed her aggressors with state validation, shocks the conscience.

352. Damages: As a direct and proximate result of the state-created danger caused by Sheriff Lawless, Chief Deputy Gore, Corporal Pizelli, and Deputy Frame, Plaintiff suffered genuine terror for her physical safety while being taken into custody, during which she begged Deputy Frame not to murder her (¶186); approximately three and a half months of fearing for her life due to escalating stalking, harassment, and nighttime intimidation by emboldened private actors (¶¶148, 189); constant fear of violence and retaliation and an inability to seek lawful protection (¶191); a life-threatening confrontation on her final day at the residence in which Plaintiff genuinely believed she would not survive (¶¶154–157); forced relocation from her home under threat; involuntary sale of her Ohio property under pressure and below intended value (¶¶179, 195–196); profound and sustained fear for her life (¶193); severe exacerbation of pre-existing PTSD and depression, resulting in

generalized anxiety disorder, insomnia, trauma-related distress, and flashbacks; a documented fear of neighbors and serious social anxiety specifically directed toward her current neighbors (¶194); and all related damages as alleged elsewhere in the Complaint.

## COUNT 13

### Conspiracy to Deprive Constitutional Rights (42 U.S.C. § 1983)

Defendant: David Lambert (Private Actor, Individual Capacity) — Acted Under Color of Law

353. Plaintiff incorporates ¶¶16, 29, 48, 52–53, 57, 62–63, 65–67, 116, 153, 161, 163, 166–171, 173–177, 192, 194–198, and 200–201 as if fully restated.

354. A private actor is liable under 42 U.S.C. § 1983 when that actor conspires with a state official pursuant to a single plan to deprive a person of a federally protected right, and a constitutional deprivation results. The conspirators need not have reduced their agreement to writing; it is sufficient that the private actor and one or more state actors reached an understanding and took coordinated steps toward a common unlawful objective.

355. David Lambert is a private actor who had a personal interest in Plaintiff being removed from Township Road 208. Plaintiff sent a letter in 2023 threatening to sue David Lambert, and David Lambert and Randall Lambert both saw that letter. (¶¶166–167)

356. Lambert's clinic, Mended Reeds Mental Health, operated on the second floor of the same building as the law firm Lambert, McWhorter & Bowling— the firm at which Magistrate Donald L. McWhorter had been a law partner of Lambert's brother, Randall Lambert. (¶67) This structural relationship gave David Lambert direct personal and familial access to both prosecutorial and judicial state authority in Lawrence County.

357. Plaintiff sought a protection order against David Lambert in February 2024 (¶63) because, after the protection-order disputes involving Tracie and Bobby began (¶48), Lambert's staff—whom Plaintiff had reported to police in 2022 for vandalizing Plaintiff's property (¶163)—began appearing again on Township Road 208 after nearly a year of not being present.

358. Magistrate McWhorter — Randall Lambert's former law partner — presided over both Case No. 24-OC-107 (Plaintiff's petition against David Lambert) and Case No. 24-OC-92 (Crockrel's petition against Plaintiff). (¶¶66–67) He dismissed Plaintiff's petition against David Lambert the day after it was filed, finding the evidence "not well taken," without a hearing. (¶63) McWhorter's repeated dismissal of Plaintiff's protective petitions — benefiting both Lambert and the coalition targeting Plaintiff — while permitting Crockrel's retaliatory petition to proceed to hearing constitutes a pattern of judicial action in furtherance of the conspiracy's objective. (¶¶52–53, 57)

359. Tracie Crockrel publicly framed the Township Road 208 dispute as involving multiple neighbors and explicitly named David Lambert in her court testimony, while also portraying Plaintiff as the source of neighborhood disruption. (¶¶62, 65) Tracie's testimony further placed David Lambert within the same group she referenced alongside other Township Road 208 neighbors (including Sandy, Kathy, and Donna). (¶62) Sandy, Kathy, and Donna live near the dead end of Township Road 208, while David Lambert lives near the beginning of Township Road 208 by the highway; the locations are approximately a 2–3-minute drive apart (about a 10–15-minute walk). In text messages, Tracie claimed to speak for Township Road 208 neighbors and asserted that "nobody in this holler likes" Plaintiff and that Plaintiff should leave. (¶29) Tracie's statements directly suggested that David Lambert, along with other Township Road 208 neighbors, wanted Plaintiff out of Township Road 208.

360. David Lambert and Randall Lambert and Philip J. Heald reached an understanding and agreement to use the criminal prosecution process and its leverage to deprive Plaintiff of her home and permanently remove her from Township Road 208. (¶¶168, 170–171, 174–175)

361. Within twenty-four hours of Plaintiff's May 27, 2023 malpractice warning to David Lambert (¶166), Randall Lambert initiated a Google Drive share request seeking access to Plaintiff's private evidence folder titled "Lambert" (¶167) — demonstrating real-time intelligence sharing between the brothers in direct response to Plaintiff's legal threat.

362. In furtherance of that agreement, Randall Lambert, acting under color of state law, participated in Plaintiff's prosecution and was listed on the criminal complaint initiating the upgraded charge despite a conflict of interest arising from his personal connection to and shared interest with David Lambert. (¶¶16, 67, 167–168)

363. Randall Lambert's participation in the prosecution—including being listed on the criminal complaint—occurred after he had notice of Plaintiff's threatened litigation against David Lambert and despite the resulting conflict of interest. (¶¶16, 67, 166–168)

364. In furtherance of that agreement, Philip J. Heald communicated and pursued dismissal terms requiring Plaintiff to sell her home, permanently leave Township Road 208, and rent elsewhere, consistent with the objective of removing Plaintiff from Township Road 208. The charge upgrade increased the criminal leverage against Plaintiff during the same period the Prosecutor's Office conditioned dismissal on Plaintiff selling her home and permanently leaving Township Road 208. (¶¶174–175)

365. Furthermore, Randall Lambert is an attorney who previously represented Sheriff Lawless and the Lawrence County Sheriff's Office in defending against civil rights violations and Monell claims. This prior attorney-client relationship established a longstanding professional alliance and loyalty between Randall Lambert and the Sheriff's Office. This entrenched relationship provided the foundation for the conspiracy: it was in Randall Lambert's interest to shield his former clients from further civil liability, while the Sheriff's Office, in turn, had a reciprocal motive to use its state authority to assist and

protect Randall's brother, David Lambert, in his disputes with Plaintiff. This mutual benefit facilitated the coordinated unlawful objective between the private actor, David Lambert, and the state actors. (¶16, ¶67, ¶¶162–168, ¶¶203–222)

366. Each of these acts advanced a single objective: to remove Plaintiff from Township Road 208, strip her of the legal and evidentiary capacity to pursue claims against Lambert and his clinic, and leave her without the ability to protect herself. David Lambert acted under color of law because the constitutional deprivations Plaintiff suffered were accomplished through joint action with state officials — including Randall Lambert's prosecutorial authority and McWhorter's judicial authority — not through independent private conduct. The rights violated include Plaintiff's Fourth Amendment right to be free from prosecution without probable cause and her Fourteenth Amendment right to due process, including the right to petition the courts without coordinated retaliatory interference.

367. Damages: As a direct and proximate result of David Lambert's participation in the conspiracy, Plaintiff suffered damages, including: 1) Property & Financial Losses: Following the prosecutor's communication that dismissal was contingent upon Plaintiff selling her home (¶175), Plaintiff sold her 3,000-square-foot, 31-acre Ohio home (which featured a pool and finished basement) and relocated to a 1,500-square-foot home on 28 acres in Kentucky with significantly reduced amenities. (¶¶195, 197) Due to the relocation, Plaintiff lost her 2.8% mortgage interest rate and assumed a 5.7% rate. (¶198) 2) Out-of-Pocket Expenses: Plaintiff incurred costs for legal defense, forced relocation, real estate agent fees, Airbnb apartment rentals required by the Prosecutor's Office,

storage rentals, and cab fares. (¶¶153, 192) 3) Employment & Credit Impact: Following the prosecution's active inquiries into Plaintiff's mental health (¶¶170–171), Plaintiff's counsel insisted she report her mental health condition to her employer. (¶176) Plaintiff was terminated from her employment at Microsoft three weeks after this disclosure. (¶¶116, 177) As a result, Plaintiff incurred between $40,000 and $50,000 in credit card debt, mortgage delinquency placing her Kentucky home at risk of foreclosure, and the need to petition for Social Security Disability. (¶¶200–201) 4) Psychological Harm: The arrest and prosecution severely exacerbated Plaintiff's pre-existing PTSD and depression, resulting in severe institutional trauma, generalized anxiety disorder, insomnia, a documented fear of police, and a profound distrust of the justice system. (¶194)

## COUNT 14

### Fourteenth Amendment Violation – Substantive Due Process (State–Private Conspiracy to Fabricate Evidence and Induce Arrest) (42 U.S.C. § 1983)

Defendants: Sheriff Jeff Lawless; Cindy Isgett (Private Actor, Acting Under Color of State Law); Corporal Kodi Pizelli; Deputy Chris Frame; Chief Deputy Michael Gore; Milton Depriest (Private Actor, Acting Under Color of State Law); Michael Long (Private Actor, Acting Under Color of State Law)

368. Plaintiff incorporates ¶¶26–27, 29–34, 37, 41, 70, 76–78, 82, 84, 87–88, 92–95, 97–104, 108, 111, 116–117, 125, 129, 133–135, 138–147, 148, 150–151, 153, 158–161, 177–184, 186, 191–196, 200–201, and 314 as if fully restated.

369. Cindy Isgett is a former Ohio State Highway Patrol ("OSHP") dispatcher who maintained overlapping personal and professional relationships with the highest-ranking officials in the Lawrence County Sheriff's Office. Chief Deputy Michael Gore — the supervising officer whom Corporal Pizelli called during Plaintiff's arrest and to whom Pizelli identified Isgett by name (¶¶100–101) — served alongside Isgett at OSHP with Isgett and her late husband. Sheriff Jeff Lawless, a self-described "longtime" friend of Gore (Flying Wheel, Vol. 63, No. 2, Apr.–June 2025, p. 33), maintained a separate direct social relationship with Isgett, as evidenced by a publicly available May 2020 Facebook post in which Sheriff Lawless's wife, Lana Lawless. (¶ 314) Deputy Michael DeLawder — the same officer who on January 23, 2024 falsely assured Plaintiff that her felony hate-crime report (Case No. 23S-5590) had been forwarded to the Prosecutor when it had not (¶¶37, 41) — participated in the same social circle. These convergent relationships establish that the Sheriff's Office's engagement with Isgett was not coincidental but was rooted in pre-existing personal and professional loyalty (¶ 314), and that the suppression of Plaintiff's reports, the failure to enforce her protection order, and the coordination with Isgett during the arrest were products of insider allegiance rather than independent law enforcement judgment. (¶¶32, 102–104)

370. The personal network extended to every civilian witness the State intended to call at trial. As identified in the State's Answer to Defendant's Demand for Discovery (Case No. 24 CRB 195 A-B), the State's witness list consisted entirely of individuals from the same interconnected social circle: Michael Long shared the Facebook network of Sheriff Lawless and Isgett; Milton Depriest was Long's hunting partner and personal friend; Tracie Crockrel, also a friend of Isgett, acted within the same Township Road 208 group that included Isgett; and Isgett herself was the insider whose relationship with the Sheriff's Office is documented above. The absence of any independent, disinterested witness among the State's prosecution case supports the inference that the case against Plaintiff was assembled from within the conspiracy rather than from neutral investigation. Isgett's central role in the neighborhood campaign is further demonstrated by Crockrel's own communications. As detailed in the Statement of Facts, Crockrel — who stated that "nobody in this holler likes" Plaintiff and told Plaintiff to "take your ass back to Russia" (¶29) — specifically referenced Cindy Isgett by name in text messages to Plaintiff and made statements elevating Isgett and her home over Plaintiff. (¶30)

371. The coordinated nature of the campaign is further evidenced by the recruitment of Michael Long and S.L.. Long maintained a documented friendly relationship with Plaintiff through at least October 2023. During Plaintiff's last recorded conversation with the Longs, Michael Long exhibited no fear of or hostility toward Plaintiff. This interaction occurred while Michael Long and his son S.L. were going to shoot squirrels, and S.L. comfortably stood near Plaintiff with firearms. S.L. mowed Plaintiff's grass every summer — conduct wholly inconsistent with any genuine fear of Plaintiff. The

Longs' abrupt shift from friendly neighbors to hostile accusers commenced only after Crockrel's November 2023 ethnic intimidation texts signaled the onset of the coordinated campaign. (¶29) S.L. subsequently served as the complainant whose accusation precipitated Plaintiff's March 15, 2024 arrest (¶70), and Michael Long provided corroborating statements portraying Plaintiff as dangerous (¶146), demonstrating that his accusations were fabricated and coordinated rather than based on genuine fear. This timeline demonstrates that the Longs were recruited into the conspiracy rather than acting on independent concerns, and that the accusations forming the basis of Plaintiff's arrest were manufactured to serve the conspiracy's objective.

372. Defendants entered into an agreement — express or implied through their coordinated course of conduct — to deprive Plaintiff of her constitutional rights by fabricating a narrative of dangerousness, inducing Plaintiff's arrest without probable cause, suppressing exculpatory evidence, and compelling Plaintiff's removal from Township Road 208. The agreement is supported by direct evidence of pre-arrest coordination: on February 20, 2024 — approximately three and a half weeks before the arrest — Plaintiff's security cameras recorded a Lawrence County Sheriff's Office vehicle traveling to Township Road 208, stopping directly across from an anti-animal-cruelty sign Plaintiff had placed near Cindy Isgett's property, proceeding to the dead end, remaining for approximately ten minutes, and returning — without generating a report or contacting Plaintiff. This visit, viewed in conjunction with the personal relationship network described above, Corporal Pizelli's subsequent identification of Isgett by name to Chief Deputy Gore during the arrest (¶¶100–101), and Pizelli's affirmative falsification of the

record to conceal that familiarity (¶102), establishes that law enforcement's engagement with Isgett was deliberate, predated the arrest, and was concealed — hallmarks of a conspiratorial agreement rather than independent police work.

373. In furtherance of this conspiracy, Defendants committed the following overt acts: (a) Fabrication of coordinated false accusations. Isgett coordinated with Depriest and Michael Long to procure false and matching witness statements alleging that Plaintiff had pointed a firearm. (¶¶70, 146) These coordinated false statements formed the basis for the arrest despite being contradicted by exculpatory video evidence that officers acknowledged viewing at the scene. (¶¶76–78) Corporal Pizelli lured Plaintiff out of her gate under false pretenses, telling Plaintiff that he was "just trying to find out what's going on" and assuring her that he could "stop" the neighbors from bothering her, and stating he wanted to "get a statement" from her and "file a report" for her. (¶94) Plaintiff wanted to report Milton Depriest as one of the harassers but was arrested immediately as soon as she came out of her gate. (¶95) (b) Concealment of the insider relationship: Corporal Pizelli identified Isgett by name to Chief Deputy Gore during the arrest — before any formal witness introduction — demonstrating prior familiarity. (¶¶100–101) Pizelli then affirmatively falsified his official report by claiming he did not know Isgett and that she merely "waved him down," a claim disproved by security camera footage. (¶102) This falsification served the conspiracy by laundering Isgett's role from coordinated insider to disinterested bystander, shielding both Isgett and the state actors from accountability. (c) Private actor management of the arrest scene: On March 15, 2024, at approximately 10:27 a.m. — approximately thirty minutes before law

enforcement arrived — Plaintiff's security cameras recorded Milton Depriest driving past Plaintiff's residence toward Michael Long's home, traveling in the opposite direction of his own residence, establishing pre-coordination between the private actors before any law enforcement involvement. (¶92) Officers permitted Milton Depriest to trespass onto Plaintiff's property during the arrest, interact with them in a familiar manner, actively assist in managing the scene, and thank them for arresting Plaintiff. (¶¶93, 97) While Plaintiff was interacting with Corporal Pizelli, Depriest entered Plaintiff's private property without permission and dropped a document that appeared to resemble a police report. (¶93) Plaintiff's security camera footage subsequently captured Depriest recounting to other neighbors his exchange with Corporal Pizelli: "...He said, 'Will you fill out a paper?' I said, 'Actually [Absolutely],' I said, 'I watched the whole thing.' He said, 'You seen the five [a punch now]?' Yes, I did. All right. So, we got it. We're good." (¶98) Depriest's claim that he witnessed a punch was fabricated — no punch occurred. Corporal Pizelli's own reports reflect the same pattern of falsification. His Incident Report Narrative claims Plaintiff was "locking her arm out straight," while his Criminal Affidavit escalates the account further, claiming Plaintiff "dropped all of her weight to the ground" and had to be "walked/carried" to the patrol car. Depriest's written witness statement inflates the account even further by claiming Plaintiff was "kicking" and "screaming" — conduct Pizelli never described in either of his reports. (d) Seizure and transport of exculpatory evidence: Corporal Pizelli seized Plaintiff's phone — containing the exculpatory recordings — directly from her hands, then proceeded with the device toward the properties of Michael Long and Cindy Isgett. (¶¶84, 99) The phone was retained for over three months despite a court order directing its return, and recordings

from the arrest timeframe were no longer present when it was ultimately returned. (¶¶133–135) Plaintiff regained access to her phone on June 26, 2024, after the device had been held in law enforcement custody for 103 days. (¶180) The return occurred twenty-nine days after the court issued its May 29, 2024 order directing release of the property. (¶181) On June 27, 2024 — the day immediately following Plaintiff's recovery of the phone and restoration of access to the video evidence — the criminal charges against Plaintiff were dismissed. (¶182) The prosecution was maintained throughout the entire period during which the phone and the recordings documenting the incident remained inaccessible to Plaintiff, and once Plaintiff recovered the video evidence, the case was terminated in her favor. (¶¶183–184) (e) Weaponization of civil process. As alleged in Count 11, law enforcement solicited Tracie Crockrel — acting within the same network as Isgett — to file a retaliatory protection order against Plaintiff that strategically included Bobby Corbin as a protected party. (¶¶58, 111, 151) This weaponization of civil process was one component of the broader coordinated campaign in which Isgett played a central role. (f) Recruitment of fabricated accusers: Michael Long and S.L. abruptly reversed a documented friendly relationship with Plaintiff — including a recorded October 2023 conversation and S.L.'s annual practice of mowing Plaintiff's grass — and aligned with the harassment campaign following the onset of coordinated neighborhood hostility signaled by Crockrel's November 2023 ethnic intimidation texts. (¶29) S.L. served as the complainant whose accusation precipitated Plaintiff's arrest (¶70), and Michael Long provided corroborating statements portraying Plaintiff as dangerous (¶146) — claims directly contradicted by their prior friendly conduct, establishing that their participation was recruited and their accusations fabricated in furtherance of the

conspiracy. (g) Destruction of Plaintiff's livelihood. The Isgett network conspired to arrest Plaintiff and thereby destroy her career, her financial stability, and her ability to sustain her life. As a result of the conspiracy, Plaintiff was forced to take constant days off from her position as a Data Scientist at Microsoft (¶¶116, 177), was forced to relocate repeatedly (¶¶179, 195), and her health severely deteriorated, exacerbating her pre-existing depression. (¶¶194, 201) These combined consequences caused irreparable damage to her career and led to the loss of her employment at Microsoft. (¶¶178, 200) (h) Conduct intended to endanger Plaintiff's life and physical safety. The Isgett network threatened to take Plaintiff's life (¶34) and then stalked and harassed her to the point where she was unable to protect herself. (¶¶148, 150) Members of the Isgett network made statements to other neighbors about Plaintiff that caused those neighbors to stalk Plaintiff's property day and night and to direct insults and slurs at Plaintiff through her security cameras. (¶145) The Isgett network then solicited the issuance of an illegal protection order against Plaintiff, thereby soliciting the deprivation of Plaintiff's civil rights. (¶151)

374. Law enforcement Defendants did not merely fail to investigate — they affirmatively abdicated their neutral investigative role by adopting the fabricated narrative originated by Isgett's network (¶159), ignoring exculpatory video evidence they acknowledged viewing at the scene (¶¶76–78), falsifying the official record to conceal insider coordination (¶¶101–102), encouraging a private actor to provide false testimony (¶111), converting a private neighborhood campaign into state-endorsed enforcement action (¶¶141–147), and endangering Plaintiff's life. (¶¶88, 108)

375. Cindy Isgett did not act independently. Her accusations were affirmatively adopted, enforced, and executed by law enforcement officers acting under color of state law. (¶¶146, 159) Accordingly, Isgett is liable under § 1983 as a willful participant in joint activity with state officials and acted under color of state law through the conspiracy alleged herein. Milton Depriest is likewise liable as a willful participant, having actively assisted officers at the scene and been encouraged by Corporal Pizelli to fabricate testimony, and acted under color of state law through his coordinated participation in the joint activity with state officials. (¶¶93, 97–98) Michael Long is liable as a willful participant whose knowingly false accusations — contradicted by his own documented prior friendly conduct — were adopted by law enforcement as the basis for Plaintiff's arrest, and acted under color of state law through his participation in the conspiracy. (¶146) S.L. is liable as a willful participant whose fabricated complaint served as the precipitating accusation for Plaintiff's arrest (¶70) and whose prior friendly relationship with Plaintiff demonstrates that the accusation was knowing and deliberate, and acted under color of state law through his participation in the conspiracy.

376. Damages: As a direct and proximate result of Defendants' conspiracy, Plaintiff suffered deprivation of liberty through false arrest and malicious prosecution (¶¶82, 158, 161); seizure and prolonged retention of personal property (¶¶84, 133); suppression of exculpatory evidence (¶¶135, 183); approximately three and a half months of escalating harassment, stalking, and intimidation by emboldened co-conspirators (¶¶138–144, 148); severe emotional distress including sustained terror and genuine fear for her life (¶¶186,

191, 193); forced relocation from her home (¶¶153, 179, 195); loss of employment (¶¶177, 200); financial losses including the forced sale of her property under duress (¶¶192, 195–196); exacerbation of pre-existing PTSD and depression (¶¶194, 201); and all related damages as alleged elsewhere in the Complaint.

## COUNT 15

## Conspiracy Motivated by Class-Based, Invidiously Discriminatory Animus (42 U.S.C. § 1985(3))

Defendants: Sheriff Jeff Lawless; Cindy Isgett (Private Actor, Acting Under Color of State Law); Corporal Kodi Pizelli; Deputy Chris Frame; Chief Deputy Michael Gore; Milton Depriest (Private Actor, Acting Under Color of State Law); Michael Long (Private Actor, Acting Under Color of State Law)

377. Plaintiff repeats and realleges ¶¶25–27, 29, 34–43, 45–53, 76–78, 81, 99, 108–109, 115, 135, 138–141, 146–147, 151, 158–159, 169, 175, 179, 182, 184–189, and 195 as if fully restated, and incorporates the conspiracy, overt acts, and coordinated conduct alleged in Count 14. This Count does not restate the conspiracy or its overt acts but addresses the class-based discriminatory animus that motivated and animated that conspiracy.

378. Under 42 U.S.C. § 1985(3), a conspiracy is actionable where it is motivated by class-based, invidiously discriminatory animus and aimed at depriving a person of equal

protection or equal privileges and immunities under the laws. National origin is a recognized protected class under § 1985(3), and explicit statements of hatred, dehumanization, and demands for expulsion based on national origin constitute direct evidence of invidious discrimination. (¶¶29, 34, 187)

379. Plaintiff is an immigrant of the first generation, of Russian national origin, who speaks with a foreign accent. Plaintiff's national origin was openly referenced by neighbors and local actors in Lawrence County, and Plaintiff was repeatedly identified as an "outsider" in the community. (¶¶25–27)

380. Explicit Expressions of Anti-Russian Animus. The conspiracy alleged in Count 14 was not motivated by neutral concerns about public safety. It was driven by class-based animus directed at Plaintiff because of her Russian national origin. This animus was expressed openly and repeatedly by the private conspirators: (a) Tracie Crockrel explicitly told Plaintiff that other neighbors hated her and that Plaintiff should "take your ass back to Russia," tying collective neighborhood hostility and demands for expulsion directly to Plaintiff's national origin. (¶29) (b) Bobby Corbin made overtly discriminatory and dehumanizing statements, including that Plaintiff "do nothing but rip off people, scam people" because she is "Russian", called Plaintiff a "Russian whore," and stated she should go back to Russia. (¶34) Corbin further referenced other neighbors who were "annoyed" by Plaintiff, demonstrating that the hostility was shared, communal, and coordinated rather than personal. (c) On March 12, 2024 — three days before Plaintiff's arrest — Plaintiff called the Lawrence County Sheriff's Office, the dispatcher

explicitly told her: 'If you don't feel comfortable living, you can move.' This statement, directed at an immigrant reporting crimes, reflected institutional hostility and echoed the private conspirators' demands for her expulsion. These statements constitute classic indicators of class-based animus: collective guilt attributed to an entire nationality, dehumanization, demands for expulsion, and the portrayal of Plaintiff as inherently violent and undeserving of protection because of her national origin. The discriminatory hostility directed at Plaintiff intensified as the armed conflict involving Russia and Ukraine escalated. The timing of the escalation in harassment, threats, and demands that Plaintiff "go back to Russia" correlated with heightened geopolitical hostility toward Russia, demonstrating that the animus was directed at Plaintiff's national origin rather than at any personal conduct by Plaintiff. (¶¶185–189)

381. Animus Escalating Into Threats of Lethal Harm. The discriminatory animus was not rhetorical. It escalated into credible threats of serious bodily harm and death. Corbin, while expressing anti-Russian hatred, swore to murder Plaintiff, stating she was "going to the ground." (¶34) These threats were communicated directly to Plaintiff, documented on video, and reported to law enforcement. (¶¶34–35) The threats were part of the same coordinated campaign to terrorize, isolate, and remove Plaintiff from the community. (¶¶138–140)

382. Notice to State Actors and Conscious Ratification. Plaintiff affirmatively reported the discriminatory statements, threats, and escalating danger to multiple state actors at every level available to her. Plaintiff contacted the Sheriff's Office and specifically identified

the conduct as a hate crime motivated by her national origin. (¶¶34–37) On February 7, 2024, Plaintiff requested to speak directly with Sheriff Jeff Lawless to demand action on the reported hate crime and felony threats. (¶¶43, 45) The dispatcher confirmed that Sheriff Lawless was unavailable but stated she would deliver Plaintiff's message directly to him. (¶46) Sheriff Lawless never returned Plaintiff's call and never contacted Plaintiff thereafter. (¶47) Plaintiff further informed Corporal Pizelli of the national-origin-based threats at the time of the March 15, 2024 arrest. (¶81) Plaintiff reported the same animus and threats to the Lawrence County Prosecutor's Office. (¶¶38–42) Plaintiff raised these facts before the Court during the protection-order proceedings. (¶¶48–51) Despite notice at every level — from dispatch to the Sheriff personally, from arresting officers to prosecutors — that Plaintiff was the target of conduct she had expressly identified as a hate crime, no state actor investigated, documented, or charged Ethnic Intimidation. Instead, the individuals expressing anti-Russian hatred were treated as credible witnesses against Plaintiff. (¶¶146, 159) This pattern of response — ignoring exculpatory evidence (¶¶76–78), reversing victim and aggressor, denying protection mechanisms to Plaintiff while leaving her aggressors unchecked (¶¶50–53, 151), and upgrading charges against Plaintiff based on fabricated narratives (¶¶109, 115, 169) — was not neutral law enforcement failure. It was the foreseeable operation of a conspiracy animated by national-origin animus and the shared objective of removing Plaintiff from the community. (¶175) State actors' knowing tolerance and ratification of the discriminatory conduct constituted adoption of the animus as state policy.

383. Animus as the Motivating Force. The discriminatory hostility toward Plaintiff's Russian national origin supplied the motive for the conspiracy alleged in Count 14 and explains why exculpatory evidence was ignored even when it disproved allegations against Plaintiff (¶¶76–78); why Plaintiff was falsely portrayed as a public safety threat despite contrary video proof (¶159); why individuals expressing explicit anti-Russian hatred and making death threats were treated as credible while Plaintiff was criminalized (¶¶34, 159); why protection was selectively denied even in the face of escalating lethal danger (¶¶50–53); and why state inaction functioned as ratification, signaling that violence and threats against Plaintiff would be tolerated and that Plaintiff's removal from the community was a shared objective of both state and private actors (¶¶29, 175)

384. Damages: As a direct and proximate result of Defendants' conspiracy motivated by class-based discriminatory animus, Plaintiff suffered all damages alleged in Count 14, as well as the distinct harm of being targeted, terrorized (¶¶34, 138–140), criminalized (¶¶158–159), and driven from her home (¶¶179, 195) because of her national origin and status as an immigrant (¶¶25, 29, 34) — in violation of the equal protection and equal privileges guaranteed by the laws of the United States. (¶187)

## COUNT 16

## MUNICIPAL LIABILITY (MONELL) — UNCONSTITUTIONAL CUSTOM

### Custom of Fabricated Official Documentation to Manufacture Probable Cause

**(42 U.S.C. § 1983; Fourth Amendment; Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978))**

Defendant: Lawrence County, Ohio

385. Plaintiff incorporates ¶¶74–78, 84, 87, 99–104, 108–111, 113–115, 119, 125, 129, 158–159, 185, 188, 191–195, and 203–216 as if fully restated.

**The Custom**

386. Lawrence County maintains a widespread, well-settled, and longstanding custom of law enforcement officers fabricating material facts in official documentation, including incident reports, affidavits, charging narratives, discovery reports, and criminal complaints, in order to manufacture probable cause where none exists. (¶210, ¶212)

387. Under this custom, deputies and supervisors routinely mischaracterize known evidence as "incriminating" (¶159), omit exculpatory facts, invent narrative escalation (¶109), and falsify witness context (¶102) in order to justify arrests, seizures, and criminal prosecutions.

388. This fabrication custom is not isolated misconduct by one officer, but an institutional practice repeatedly demonstrated in prior federal litigation involving Lawrence County deputies, including cases involving federal indictments for falsified records and

subsequent civil-rights litigation showing repeated recurrence of similar fabrication techniques. (¶¶210–215)

389. This fabrication custom constitutes deliberate indifference to constitutional rights and is the moving force behind unlawful arrests, malicious prosecutions, and deprivation of liberty without probable cause.

**Plaintiff's Case as Direct Manifestation of the Custom**

390. Plaintiff's arrest and prosecution on March 15, 2024, is a direct and foreseeable manifestation of Lawrence County's custom of fabricating official documentation to manufacture probable cause. On March 15, 2024, Corporal Pizelli was shown exculpatory video footage proving Plaintiff never pointed a firearm and committed no criminal offense. (¶¶76–77) Deputy Pizelli therefore possessed actual knowledge at the scene that Plaintiff did not commit the conduct alleged by private witnesses. (¶¶76–78) Despite possessing actual knowledge of the exculpatory evidence, Pizelli authored official reports and conveyed to prosecutors that the video was "incriminating," thereby materially falsifying the evidentiary basis of probable cause. (¶87, ¶159) The criminal complaint filed in Ironton Municipal Court Case No. CRB2400195A, charging Plaintiff with Aggravated Menacing, was therefore premised on a knowingly false description of video evidence. (¶¶158–159)

391. Corporal Pizelli abandoned his duty of neutrality and explicitly solicited a statement from Tracie Crockrel "to show the court this is an ongoing problem," for the express purpose of upgrading the charge from Menacing to Aggravated Menacing. (¶¶109–111) This solicitation was not investigative. It was evidentiary manufacturing designed to fabricate an element of the charged offense that did not exist. Corporal Pizelli deliberately omitted material impeachment evidence from official reports and charging narratives, including Tracie Crockrel's history of criminal conduct and her sworn testimony given four days prior to the arrest admitting Plaintiff had never threatened her. (¶¶113–114) By sanitizing the record and presenting Crockrel as a credible and fearful victim, Corporal Pizelli created a false evidentiary foundation to sustain the prosecution. (¶115)

392. Corporal Pizelli and Chief Deputy Michael Gore falsely represented that Corporal Pizelli had no prior relationship with Cindy Isgett, portraying the investigation as neutral and independent. (¶102) In reality, security footage captured Corporal Pizelli identifying Cindy Isgett by name during the arrest and coordinating with Chief Deputy Gore, a longtime associate of Isgett. (¶¶100–101) Corporal Pizelli further fabricated the narrative of how Cindy Isgett became a "witness," including the demonstrably false claim that she "waved down" the officer. (¶¶102–104)

393. Corporal Pizelli authored an official incident report falsely claiming that he explicitly "informed dispatch" that Plaintiff "would not allow him near her," and that dispatch subsequently sent another unit in response. (¶74) However, audio recordings establish

that Corporal Pizelli never contacted dispatch to report Plaintiff's behavior, and that the second unit actually arrived automatically due to a standard protocol. (¶75) This fabricated narrative of Plaintiff's behavior was used to justify a premeditated arrest and portray Plaintiff as dangerous in official records. (¶74, ¶159)

**Pattern Evidence Demonstrating the County Custom**

394. Lawrence County's unconstitutional fabrication custom is demonstrated by multiple independent incidents involving falsified official documentation by Lawrence County deputies, including incidents established through criminal prosecutions, federal indictments, and civil-rights litigation. (¶¶210–215)

395. In Kinstler v. Lawrence County, Ohio, No. 1:15-cv-139 (S.D. Ohio), Lawrence County deputies Jeremy Hanshaw, Ronald Hatfield, and Jason Mays were federally indicted for falsifying official logs and incident reports to create a false justification for assaulting an inmate and to conceal misconduct. (¶¶212)

396. In Stager v. Hanshaw, No. 1:23-cv-120 (S.D. Ohio), Deputy Jeremy Hanshaw—previously indicted in Kinstler—was alleged to have filed criminal complaints containing fabricated facts and charged the plaintiff with Obstructing Official Business and Resisting Arrest to justify unlawful force. The prosecution terminated via nolle prosequi. (¶214)

397. In Patrick v. Lawless, No. 1:9-cv-00608-MRB (S.D. Ohio, W.D.), Deputy Charles Hammonds charged bicyclist Anthony Patrick with "Riding a Bicycle on the Roadway," resisting arrest, and failing to obey a lawful order. The court found the deputy's order was "unlawful," and the prosecution dismissed all charges. (¶211)

398. In Sprouse v. Mitchell, No. 1:23-cv-353 (S.D. Ohio), Detective Jason Newman coerced a citizen's signature under threat of arrest, misrepresented the nature of a legal document, and facilitated the filing of criminal charges that were later dismissed. (¶213)

399. The same fabrication mechanism—mischaracterizing evidence, omitting material facts, and inventing narrative escalation—was directly applied in Plaintiff's case on March 15, 2024.

**Constitutional Violation**

400. The Fourth Amendment prohibits seizures and prosecutions initiated without probable cause.

401. Fabrication of evidence and falsification of official reports to create probable cause violates clearly established constitutional rights.

402. A law enforcement officer violates the Constitution by knowingly fabricating evidence or testimony and using that fabricated evidence to initiate or sustain a prosecution.

403. Plaintiff was arrested and prosecuted based on knowingly false official documentation created by Lawrence County deputies, including false characterization of exculpatory video as incriminating, false escalation narrative, and omission of material impeachment evidence. (¶87, ¶109, ¶159)

**Monell Elements**

404. A municipality is liable under 42 U.S.C. § 1983 where an official policy or widespread custom causes a constitutional deprivation. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).

405. A custom may be established where practices are so permanent and well-settled as to have the force of law. Lawrence County maintained a widespread custom of fabricating official documentation to manufacture probable cause.

406. Lawrence County's policymakers were on actual or constructive notice of this practice due to prior federal litigation and federal indictments involving falsified reports and fabricated narratives. Lawrence County failed to discipline or correct this practice, thereby demonstrating deliberate indifference.

407. Lawrence County's fabrication custom was the moving force behind Plaintiff's arrest, malicious prosecution, and deprivation of liberty.

408. Causation. Corporal Pizelli's fabricated official documentation was a direct and proximate cause of Plaintiff's arrest, the filing of charges, the continuation of prosecution, and the seizure of Plaintiff's phone and evidence. But for Pizelli's falsification of official records, probable cause would not have existed, and Plaintiff would not have been criminally charged.

409. Damages. As a direct and proximate result of Lawrence County's unconstitutional fabrication custom, Plaintiff suffered deprivation of liberty, reputational harm, financial loss, emotional distress, trauma exacerbation, and loss of property interests. (¶119, ¶185, ¶188, ¶191, ¶192, ¶194, ¶195)

**COUNT 17**

**MUNICIPAL LIABILITY (MONELL) — UNCONSTITUTIONAL CUSTOM**

**Custom of Suppression and Concealment of Exculpatory Evidence**

**(42 U.S.C. § 1983; Fourth Amendment;**

**Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978);**

Defendant: Lawrence County, Ohio

410. Plaintiff incorporates ¶¶40–43, 47, 69, 76–78, 84–86, 100–101, 116–117, 133–137, 161, 180–184, and 203–222 as if fully restated.

**The Custom**

411. Lawrence County maintains a widespread, well-settled custom of suppressing, concealing, manipulating, and withholding exculpatory evidence in criminal investigations and prosecutions. (¶¶203–209) This custom includes seizure and prolonged retention of phones containing exculpatory evidence, failure to preserve recordings, manipulation of video recording systems, withholding discovery materials, and preventing courts from receiving objective evidence that negates probable cause. (¶86, ¶133, ¶¶203–207)

412. The purpose and predictable effect of this custom is to prevent judges, defense counsel, and prosecutors from viewing evidence that would undermine law enforcement narratives and expose fabrication. This suppression custom functions as an institutional tool to sustain prosecutions that could not survive if exculpatory evidence were timely disclosed.

413. This suppression custom operates through a chain of command from deputies to the Sheriff. Deputies suppress, conceal, or manipulate evidence at the scene or in the jail, and the Sheriff—as final policymaker—receives notice through federal indictments, federal

lawsuits, court orders, and settlements, yet takes no corrective action. (¶¶203–207, ¶217, ¶222)

**Plaintiff's Case as Direct Manifestation of the Custom**

414. Plaintiff's prosecution is a direct manifestation of Lawrence County's custom of suppressing exculpatory evidence.

415. On March 15, 2024, Plaintiff presented Corporal Pizelli with video evidence from her phone and security cameras proving she never pointed a firearm and committed no criminal offense. Corporal Pizelli viewed this exculpatory evidence. (¶¶76–78). Despite having actual knowledge of Plaintiff's innocence, Corporal Pizelli unlawfully seized Plaintiff's phone without a warrant. (¶¶84–85)

416. The Plaintiff's phone was retained for over three and one-half months. Plaintiff's phone continued to be withheld for approximately twenty-nine (29) days in defiance of a court order requiring its return. (¶134)

417. During the pendency of Plaintiff's prosecution, Corporal Pizelli failed to produce body-worn camera footage, despite representing that recordings existed. (¶¶136–137).

418. The absence of body-worn camera footage concealed objective evidence that would have corroborated Plaintiff's innocence and exposed the falsity of deputies' written narratives. (¶¶136–137).

419. The suppression of Plaintiff's exculpatory video evidence directly caused the continuation of criminal proceedings. (¶161, ¶183).

420. Plaintiff's charges were dismissed immediately after Plaintiff regained access to her phone and produced the suppressed video evidence to the court. The timing of dismissal demonstrates the prosecution could not survive once the suppressed evidence was revealed. (¶¶180–184)

**Pattern Evidence Demonstrating the County Custom**

421. Lawrence County's unconstitutional suppression custom is demonstrated by multiple independent incidents involving concealment, withholding, or manipulation of objective evidence.

422. In Patrick v. Lawless, No. 1:9-cv-00608-MRB S.D. Ohio, W.D.), videotape evidence of a deputy's use of force was never provided to the plaintiff's criminal or civil lawyers during the course of the litigation. (¶¶203–209)

423. In Kinstler v. Lawrence County, Ohio, No. 1:15-cv-139 (S.D. Ohio), Deputy Jason Mays physically positioned himself in front of the jail's surveillance camera while Deputies Hanshaw and Hatfield assaulted a handcuffed inmate—deliberately blocking the video record. (¶205)

424. In Anderson v. Lawless, No. 1:18-cv-380 (S.D. Ohio), photographs documenting the plaintiff's injuries either were not taken or were not preserved, and the court ordered Defendants to produce or explain the absence of such records. (¶206)

425. In Assi v. Hanshaw, No. 1:20-cv-839 (S.D. Ohio), the camera's brightness levels were allegedly adjusted on a jail surveillance camera so that the inmate's written notes could not be read on the video recording. (¶207)

426. In the Newman DUI incident, on-duty Lawrence County deputies intervened to prevent the Ohio State Highway Patrol from conducting an independent investigation of off-duty Deputy Newman's drunk driving accident. (¶208)

427. Plaintiff's case fits squarely into the same pattern: seizure of the phone containing exculpatory evidence, prolonged withholding, nonproduction of recordings, and continuation of prosecution until the suppressed evidence surfaced.

**Tacit Approval and Acquiescence by Final Policymaker**

428. Lawrence County's repeated tolerance of evidence suppression, including seizure and concealment of recordings, constitutes deliberate indifference to the constitutional rights of persons within its jurisdiction.

429. Sheriff Jeff Lawless was placed on direct notice of his deputies' unconstitutional suppression of evidence through the federal indictments of Deputies Hanshaw, Hatfield, and Mays in Kinstler; the federal civil rights lawsuits in Patrick v. Lawless, Kinstler v. Lawrence County, Anderson v. Lawless, and Assi v. Hanshaw, the intervention by on-duty deputies to shield Deputy Newman from a DUI investigation; and the court order in Anderson directing the production of suppressed injury documentation. (¶¶203–209, ¶220)

430. In each of these matters, Sheriff Lawless was personally named as a defendant, his office was named as a defendant, or he publicly addressed the misconduct — placing him on direct and actual notice of the unconstitutional suppression custom being carried out by his deputies. (¶¶203–209, ¶222)

431. Sheriff Lawless gave his tacit approval and acquiesced in this custom by repeatedly failing to discipline or terminate the offending deputies across all of these incidents spanning fourteen years. He retained Deputies Hanshaw, Hatfield, and Mays following their federal indictment in Kinstler, retained Deputy Spoljaric following Anderson, and retained Deputy Newman following the DUI incident — each time failing to remove, discipline, or reassign the offending deputies. (¶203, ¶¶216–217, ¶¶219–220, ¶222)

432. This custom of tolerance and acquiescence, repeated across Patrick, Kinstler, Anderson, Assi, and Newman created the well-settled practice within the Lawrence County Sheriff's Office that directly caused Corporal Pizelli and Deputy Frame to suppress Plaintiff's exculpatory evidence without fear of consequence and was the moving force behind Plaintiff's prolonged prosecution and deprivation of liberty.

**Chain-of-Command Suppression — Institutional Pattern**

433. Lawrence County's suppression of exculpatory evidence operates through a chain of command running from line deputies to the Sheriff. This chain-of-command suppression is an institutional practice of Lawrence County that existed before, and independently of, Plaintiff's case. It is not a custom that arose from or is confined to Plaintiff's prosecution. It is a well-settled, county-wide pattern documented across more than fourteen years and at least six independent incidents. (¶¶203–222)

434. At the line-deputy level, the suppression custom has been carried out across multiple independent incidents: by Deputy Charles Hammonds in Patrick v. Lawless; by Deputies Jason Mays, Jeremy Hanshaw, and Ronald Hatfield in Kinstler v. Lawrence County; by Deputies Ronald Hatfield and Brad Spoljarik in Anderson v. Lawless; by Deputy Jeremy Hanshaw in Assi v. Hanshaw; and by Corporal Kodi Pizelli in Plaintiff's case. (¶69, ¶¶204–207, ¶219)

435. At the supervisory level, Chief Deputy Michael Gore participated directly in Plaintiff's case. At approximately 11:30 a.m. on March 15, 2024, Corporal Pizelli placed a call to Chief Deputy Gore during the course of Plaintiff's arrest. Chief Deputy Gore coordinated with Corporal Pizelli regarding the investigation and the involvement of Cindy Isgett. No supervisory intervention was taken to preserve or produce Plaintiff's exculpatory video evidence. (¶¶100–101)

436. At the policymaker level, Sheriff Jeff Lawless occupies the apex of this chain of command. The felony report documenting Bobby Corbin's death threat against Plaintiff and the supporting video evidence were retained at the Lawrence County Sheriff's Office and never transmitted to the Prosecutor's Office. On January 30, 2024, the Prosecutor's Office stated on a recorded call that the evidence was likely "still sitting on the sheriff's desk." On February 7, 2024, Plaintiff attempted to contact Sheriff Lawless directly to demand the release of the evidence; Sheriff Lawless did not return Plaintiff's call and took no action to produce the evidence. (¶¶40–43, ¶47)

437. The chain-of-command suppression custom thus operates identically across all documented incidents: line deputies suppress, conceal, or manipulate exculpatory evidence at the point of contact; the supervisory command structure provides cover or active coordination; and Sheriff Lawless, as final policymaker, receives notice through federal indictments, civil rights lawsuits, court orders, and settlements, and takes no corrective action. This general institutional pattern is consistent with ¶¶203–209 and is not a custom invented for or limited to Plaintiff's case.

**Monell Elements**

438. Municipal liability attaches where a constitutional violation results from a widespread custom that policymakers knew or should have known about and failed to correct.

439. Lawrence County's repeated tolerance of evidence suppression, including seizure and concealment of recordings, constitutes deliberate indifference.

440. The repeated litigation involving suppression of evidence placed Lawrence County on actual and constructive notice of the unconstitutional practice. Lawrence County's policymaker acquiesced in this custom through inaction across multiple incidents spanning fourteen years.

441. This unconstitutional custom was the moving force behind Plaintiff's prolonged prosecution and deprivation of liberty.

442. Causation. The seizure and withholding of Plaintiff's phone caused Plaintiff to lose access to exculpatory proof and prevented timely dismissal. Defendants' suppression of evidence caused Plaintiff to remain under prosecution until the concealed evidence was finally presented.

443. Damages. Plaintiff suffered deprivation of liberty, financial losses, emotional distress, reputational harm, trauma exacerbation, and other compensatory damages. (¶¶185–202)

## COUNT 18

## MUNICIPAL LIABILITY — UNCONSTITUTIONAL CUSTOM

**Custom of Favoritism, Selective Enforcement, and Protection of "Insiders" (42 U.S.C. § 1983; Fourteenth Amendment Equal Protection Clause) Defendant: Lawrence County, Ohio**

444. Plaintiff incorporates ¶¶25, 27, 31, 33–34, 54, 63–67, 76, 82, 84, 87, 99, 100–101, 108, 114, 158, 162–168, 182, 184–202, 210–223, 314, and 369 as if fully restated.

### The Custom

445. Lawrence County maintains a widespread, well-settled custom of selective enforcement of the law based on insider status and favoritism, whereby law enforcement protects deputies, relatives, and politically connected individuals ("insiders") while aggressively targeting outsiders. (¶27, ¶¶216–222)

446. Under this custom, criminal laws are not enforced neutrally. Instead, enforcement decisions are driven by local status, personal relationships, political connections, and

retaliatory motives. This custom results in outsiders being arrested, prosecuted, and deprived of rights, while insiders receive de facto immunity even for felony conduct. (¶¶216–222)

**Plaintiff's Case as Direct Manifestation of the Custom**

447. Plaintiff, a non-local resident with a foreign accent, was treated as an outsider by Lawrence County officials. Sheriff's Office dispatchers told Plaintiff, "If you don't feel comfortable living, you can move," (¶379) demonstrating institutional hostility toward outsiders rather than providing neutral police protection. Plaintiff presented video evidence proving she committed no crime, yet she was arrested and prosecuted. Plaintiff's neighbor, a local insider with a documented violent criminal history, was effectively granted immunity for felony threats and intimidation. (¶25, ¶27, ¶34, ¶54, ¶76, ¶82, ¶114, ¶158, ¶187)

448. Lawrence County used criminal enforcement mechanisms to advance the private interests of connected insiders, including the Lambert family and Cindy Isgett. As a former Ohio State Highway Patrol dispatcher, Isgett maintained overlapping personal and professional relationships with the Sheriff's Office command staff—including serving alongside Chief Deputy Gore and maintaining a documented social relationship with Sheriff Lawless. The disparate treatment of Plaintiff compared to these connected insiders demonstrates selective enforcement and favoritism rather than neutral policing. (¶¶63–67, ¶¶100–101, ¶¶162–168, ¶¶216–222, ¶314, ¶369)

**Pattern Evidence Demonstrating the County Custom**

449. Lawrence County's selective enforcement custom is demonstrated by repeated incidents showing police protecting their friends, colleagues, and connected locals ("insiders") while weaponizing the law against unconnected citizens and non-locals ("outsiders"). (¶27, ¶187, ¶¶210–222)

450. In the Newman DUI incident, multiple deputies allegedly sought to prevent independent investigation of an off-duty deputy's drunk driving accident, and another deputy took over the case. The off-duty deputy was charged only with failure to yield to a traffic signal. Sheriff Lawless kept him on active duty, demonstrating extreme favoritism to protect a police insider. (¶220)

451. In a prior incident, Kinstler v. Lawrence County, No. 1:15-cv-139 (S.D. Ohio), involving the assault of a handcuffed inmate, three deputies were federally indicted. Following their acquittal, Sheriff Lawless retained all three without discipline or reassignment, proving that police insiders are treated as above the law. (¶217)

452. In another incident, Templeton v. Brandt, No. 1:20-cv-34 (S.D. Ohio), Sheriff Lawless allegedly offered to release the arrested Mayor of Chesapeake in exchange for the Mayor's agreement not to speak to his neighbor. This demonstrated the Sheriff weaponizing an arrest to negotiate a personal favor for a connected local insider. (¶221)

453. In Sprouse v. Mitchell, No. 1:23-cv-353 (S.D. Ohio), a Lawrence County detective used criminal charges to serve ulterior purposes and facilitated the permanent deprivation of 60 of 67 seized dogs after the charges were dismissed. The target was an unconnected citizen lacking insider status, illustrating how the law is aggressively used against those without protection. (¶213, ¶220)

**Tacit Approval by the Final Policymaker**

454. Sheriff Jeff Lawless, the final policymaker for Lawrence County law enforcement, had actual notice of this custom and provided his tacit approval by repeatedly failing to discipline deputies who engaged in favoritism, and by directly participating in selective enforcement himself. (¶¶216–222)

455. By personally participating in selective enforcement and routinely failing to discipline deputies who shielded insiders, Sheriff Lawless created a well-settled culture of impunity where deputies knew that protecting personally or politically connected individuals would be tolerated or ignored. (¶¶216–222)

456. This well-settled custom of selective enforcement was the moving force behind the constitutional violations suffered by Plaintiff.

**Constitutional Violation**

457. The Equal Protection Clause prohibits selective enforcement of the law based on arbitrary favoritism or discriminatory animus.

458. Selective enforcement and class-of-one discrimination violate the Fourteenth Amendment when similarly situated persons are treated differently without rational basis.

459. Lawrence County deprived Plaintiff of equal protection by selectively enforcing criminal law against Plaintiff while shielding insiders and aggressors.

**Monell Elements**

460. A municipality is liable where a widespread custom of discriminatory selective enforcement causes constitutional injury. Lawrence County's repeated insider-protection pattern placed policymakers on notice of the discriminatory enforcement custom.

461. Lawrence County failed to discipline or correct this practice, constituting deliberate indifference. This custom was the moving force behind Plaintiff's wrongful arrest, prosecution, and deprivation of rights.

462. Causation. Plaintiff would not have been arrested or prosecuted but for Lawrence County's insider favoritism custom. Plaintiff's aggressors would have been investigated and prosecuted if enforcement were neutral and not influenced by insider status.

463. Damages. Plaintiff suffered deprivation of liberty, emotional distress, reputational harm, financial loss, trauma exacerbation, and other compensatory damages. (¶¶185–202)

**COUNT 19**

**MUNICIPAL LIABILITY (MONELL) — SUPPRESSION OF FELONY THREAT EVIDENCE (Pled in the Alternative: Single Policymaker Decision or Ratification) (42 U.S.C. § 1983; Fourth and Fourteenth Amendments)**

Defendant: Lawrence County, Ohio

464. Plaintiff incorporates ¶¶34–35, 38–47, 54–56, 70–71, 88–89, 135, 137, 140–141, 147, 159, and 185–202 as if fully restated.

465. Under Ohio law, the Sheriff of Lawrence County is the final policymaker for law enforcement operations, including the handling of evidence and the referral of felony cases for prosecution.

466. On December 28, 2023, Plaintiff reported to the Lawrence County Sheriff's Office that neighbor Bobby Corbin committed aggravated menacing and ethnic intimidation, and threatened to kill Plaintiff. (¶34)

467. Plaintiff reported she possessed video evidence of the death threat. (¶35)

468. On January 19, 2024, Plaintiff contacted the Sheriff's Office to confirm that the felony hate-crime report and video evidence had been transmitted to the Prosecutor's Office. (¶38)

469. Plaintiff encountered obstruction and could not verify transmission. (¶39)

470. On January 22, 2024, a Sheriff's Office representative affirmatively represented to Plaintiff that "every report... is turned over to the prosecutor." (¶40)

471. Later on January 22, 2024, the Lawrence County Prosecutor's Office stated on a recorded call that it had no record of the felony case or video evidence, stating that "law enforcement would still have it in their hands." (¶40)

472. Plaintiff immediately contacted the Sheriff's Office again and reported that the Prosecutor stated it had no case and no videos. (¶41)

473. On January 30, 2024, the Prosecutor's Office admitted on a recorded call that the felony report and video evidence had not made it to prosecutors. The representative explained the county's procedure requiring the Sheriff's direct review, stating: "once the sheriff's reviewed it, it comes over to the prosecutor's office," and admitted the evidence was likely "still sitting on the sheriff's desk." (¶42)

474. On February 7, 2024, Plaintiff called and demanded to speak directly with Sheriff Jeff Lawless regarding the ongoing suppression of the hate-crime evidence and the escalating danger posed by Corbin. (¶43, ¶45)

475. A Sheriff's Office representative stated they could not reach the Sheriff, took Plaintiff's message, and stated: "I will put this in his box." (¶46)

476. Sheriff Lawless never returned Plaintiff's call, took no corrective action, and the evidence was deliberately retained rather than transmitted for prosecution. (¶47)

477. On March 1, 2024 — two weeks before Plaintiff's arrest — Plaintiff called the Prosecutor's Office again regarding the felony report on Bobby Corbin's death threats, Case No. 23S-5590. The Prosecutor's Office did not confirm receipt of the felony report or video evidence and directed Plaintiff to call the police instead, stating: "You need to call the police department." As of March 1, 2024, the felony report and video evidence had still not been transmitted.

**Alternative Theories of Municipal Liability**

478. Federal rules permit pleading in the alternative. Lawrence County is liable for the unconstitutional suppression of this evidence under either of the following alternative theories of municipal liability:

479. Alternative A (Single Decision by Final Policymaker): Based on the Prosecutor's admission that the evidence was "sitting on the sheriff's desk," Sheriff Lawless exercised personal, contemporaneous possession and control over the evidence. His deliberate, discretionary choice to retain the evidence and block its transmission constituted a single decision by a final municipal policymaker, which automatically becomes official county policy. (¶42)

480. Alternative B (Ratification): Alternatively, to the extent subordinate deputies initially suppressed the evidence, Sheriff Lawless knowingly acquiesced in and ratified their unconstitutional conduct. By ignoring Plaintiff's direct February 7, 2024 report and taking no corrective action to investigate his deputies or transmit the evidence, the Sheriff's ratification became official county policy. (¶¶43–47)

**Constitutional Violation & Causation**

481. Under either theory, this policymaker-level suppression directly deprived Plaintiff of Equal Protection under the law by granting de facto immunity to a favored local aggressor, while affirmatively increasing Plaintiff's vulnerability to private violence in violation of the Fourteenth Amendment.

482. This official county policy was the moving force behind Plaintiff's continued danger, her exposure to escalating threats, and her subsequent wrongful arrest and prosecution.

By intentionally concealing objective video evidence of Bobby Corbin's death threats from the Prosecutor's Office, Sheriff Lawless affirmatively emboldened Plaintiff's aggressors, facilitated the escalating neighborhood harassment campaign, and ensured Plaintiff would be treated as a criminal suspect rather than a protected victim. Specifically, suppressing this crucial context created an evidentiary vacuum that allowed those same aggressors to successfully weaponize the police against Plaintiff, making her wrongful arrest the direct and foreseeable result of the Sheriff's deliberate decision to hide her evidence. (¶¶42–47, ¶¶54–56, ¶¶70–71, ¶¶88–89, ¶159)

483. Damages. Plaintiff suffered increased danger, severe emotional distress, deprivation of due process, and other compensatory damages. (¶¶185–202)

**COUNT 20**

**MUNICIPAL LIABILITY (MONELL) — STATE-CREATED DANGER**

**(42 U.S.C. § 1983; Fourth and Fourteenth Amendment Substantive Due Process;**

**Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978))**

Defendant: Lawrence County, Ohio

484. Plaintiff incorporates ¶¶13, 34–35, 38–42, 48–49, 54–56, 75–78, 82, 84–89, 100–111, 115, 117–119, 133, 137–139, 151, 159, 191, 194, 203–222, and 369 as if fully restated.

**Scope of This Count**

485. This Count does not challenge the legality of Plaintiff's arrest or the decision to prosecute her. Those claims are addressed in Counts 16–18 under the Fourth and Fourteenth Amendments. This Count addresses a distinct constitutional injury: the affirmative acts of Lawrence County officials that stripped Plaintiff of her ability to protect herself from private violence by Bobby Corbin, a neighbor who had threatened to kill her and against whom Plaintiff held an active Civil Stalking Protection Order. This Count arises under the Fourth and Fourteenth Amendment's substantive due process guarantee, which protects against state action that affirmatively creates or increases a citizen's vulnerability to private violence.

486. Deputies did not merely fail to protect Plaintiff; after receiving actual notice of a specific threat from Corbin, they affirmatively exercised state authority to disable Plaintiff's ability to document threats and preserve evidence, thereby placing her in a more dangerous position than before state intervention. (¶¶84–89, ¶¶105–108)

**The Known Private Danger: Bobby Corbin**

487. Between December 2023 and March 2024, Plaintiff repeatedly reported to the Lawrence County Sheriff's Office that her neighbor Bobby Corbin had threatened to kill her and had engaged in ethnic intimidation directed at Plaintiff on account of her Russian national origin. (¶34, ¶54–55)

488. On December 28, 2023, the Lawrence County Court of Common Pleas granted an ex parte Civil Stalking Protection Order against Bobby Corbin (Case No. 23 OC 859), recognizing the immediate danger Corbin posed to Plaintiff. (¶¶48–49)

489. Plaintiff provided the Sheriff's Office with video recordings documenting Corbin's death threats and ethnic slurs. (¶¶34–35, ¶38)

490. Plaintiff reported violations of the active protection order against Corbin, including Corbin repeatedly speeding on a dirt bike within the prohibited 500-foot zone. The Sheriff's Office did not take enforcement action against Corbin for reported violations. (¶¶54–56)

491. On March 15, 2024 — the date of the incident giving rise to this action — Plaintiff explicitly warned the responding deputies that the neighbors present at the scene were hostile, that Bobby Corbin had threatened her life, and that she had an active protection order against Corbin. Plaintiff specifically identified Corbin as a threat, stating: "The guy who threatened to murder me... I have a protection order from him." (¶¶88–89)

**The Affirmative Act That Created the Danger**

492. The Sixth Circuit recognizes the state-created danger doctrine, under which liability arises where state actors take affirmative acts that create or increase the risk of private violence against a specific individual. To state a claim, a plaintiff must show: (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.

493. Lawrence County deputies took the following affirmative act on and after March 15, 2024, which created or increased Plaintiff's vulnerability to private violence by Bobby Corbin.

494. Corporal Pizelli, acting under color of law, initiated and solicited a court-facing written statement from Tracie Crockrel—Corbin's girlfriend—for the express purpose of influencing judicial action against Plaintiff ("to show the court this is an ongoing problem") and embedding it in the official incident record, thereby using state authority to generate legal process adverse to Plaintiff and protective of Corbin. (¶¶109–111) It was reasonably foreseeable that this state-initiated, court-facing submission would be used to seek judicial restraints against Plaintiff. A civil protection order thereafter issued that named Corbin as a protected party and restricted Plaintiff from recording him,

thereby legally impairing Plaintiff's capacity to document threats and violations by the very person who had threatened to kill her. (¶115, ¶151)

495. Corporal Pizelli's solicitation of the protection order against Plaintiff — an order that made Corbin a protected party and prohibited Plaintiff from recording him — is directly analogous to the officers in Stemler who physically placed the victim in the custody of her abuser. Stemler v. City of Florence, 126 F.3d 856 (6th Cir. 1997). Here, the deputy affirmatively engineered a legal instrument that shielded the known aggressor from documentation and enforcement while simultaneously exposing Plaintiff to continued private violence without any means of creating a record. The effect was to reverse the existing protection order framework: Corbin, who had been subject to a protection order protecting Plaintiff, became a party protected from Plaintiff. (¶49, ¶¶109–111, ¶115, ¶151)

496. Foreseeable Consequences and Emboldenment (Context for Causation and Knowledge). Following Plaintiff's arrest, Corbin repeatedly violated the active Civil Stalking Protection Order by passing Plaintiff's property within the prohibited distance multiple times, both on foot and in his vehicle. In the wake of the deputies' affirmative legal silencing of Plaintiff, the County's continuing refusal to enforce Corbin's violations reinforced the message of impunity and confirms the foreseeability of the private violence risk the deputies had increased. (¶¶138–139)

**The Elements of the State-Created Danger Doctrine Are Satisfied**

497. Element One — Affirmative Act: Unlike a mere failure to protect, the affirmative state conduct at issue is the initiation and solicitation of court-facing statements that foreseeably resulted in legal restraints shielding Corbin and impairing Plaintiff's documentation. This is not an omission. It is the kind of affirmative state conduct that the Sixth Circuit has repeatedly held satisfies the first element of the state-created danger doctrine. (¶¶109–111, ¶115)

498. Element Two — Special Danger: Plaintiff faced a specific, particularized danger from Bobby Corbin — not a generalized risk to the public. Corbin had threatened to kill Plaintiff specifically, Corbin lived in immediate proximity to Plaintiff's residence, and the Court had already recognized the danger by granting the ex parte protection order. Pizelli' act did not create a risk to the public at large; it created a targeted vulnerability for Plaintiff alone. (¶13, ¶34, ¶49)

499. Element Three — State Knowledge: Corporal Pizelli knew of the specific danger to Plaintiff because Plaintiff told him. On March 15, 2024, Plaintiff explicitly warned the responding officer that Bobby Corbin had threatened her life and that she had an active protection order against him. Despite this actual knowledge, Corporal Pizelli affirmatively facilitated the legal instrument that would shield Corbin and strip Plaintiff of her ability to document his conduct. This exceeds the "knew or should have known" standard; Corporal Pizelli had actual knowledge of the danger to Plaintiff. (¶¶88–89, ¶111, ¶115)

**Conscience-Shocking Conduct**

500. Substantive due process requires that the state's conduct "shocks the conscience." In non-emergency, deliberative contexts, the conscience-shocking standard is met by "deliberate indifference."

501. Corporal Pizelli's conduct was not a split-second emergency decision. Corporal Pizelli was at Plaintiff's property for an extended period during which he viewed Plaintiff's exculpatory video evidence, heard Plaintiff's repeated warnings about Corbin, and had time to deliberate. He then made the deliberate choice to solicit the protection order that shielded her aggressor. This deliberate course of conduct in a non-emergency setting satisfies the conscience-shocking standard under the deliberate indifference test. (¶¶75–78, ¶¶88–89, ¶¶110–111)

502. Corporal Pizelli had time for unhurried deliberation, reviewed Plaintiff's evidence and warnings, and then deliberately chose to facilitate legal restraints impairing Plaintiff's documentation—conduct that satisfies deliberate indifference in a non-emergency setting. (¶¶75–78, ¶¶88–89, ¶¶110–111, ¶115)

**Monell Liability: County Custom as the Moving Force**

503. A municipality is liable under Monell when its custom or policy is the "moving force" behind the constitutional violation. The customs documented in Counts 16–18 were the moving force behind the deputies' affirmative act that created the danger to Plaintiff:

504. The Custom of Evidence Suppression (Count 17) operated through two separate acts of suppression that together created and sustained the danger to Plaintiff. First, the Sheriff suppressed Plaintiff's felony report and video evidence of Corbin's death threats by failing to transmit them to the Prosecutor's Office. Because of this suppression, no criminal case was ever initiated against Corbin, leaving him free, unpunished, and emboldened. Second, Corporal Pizelli suppressed Plaintiff's exculpatory video evidence on March 15, 2024 by characterizing it as "incriminating" rather than exculpatory, leading to Plaintiff's arrest and leaving her under continuing danger from Corbin for 3.5 months. (¶¶38–42, ¶86–87, ¶133, ¶159)

505. The Custom of Fabricated Documentation (Count 16) was the moving force behind the deputies' decision to characterize Plaintiff's video evidence as "incriminating" when it was exculpatory, and to arrest Plaintiff rather than the aggressor. Because of this custom, Corbin was left free and unmonitored while Plaintiff was arrested. (¶82, ¶87, ¶138, ¶159, ¶¶210–215)

506. The Custom of Favoritism and Protection of Insiders (Count 18) was the moving force behind Corporal Pizelli's affirmative solicitation of the protection order that shielded Corbin and silenced Plaintiff, to help Cindy Isgett, who was herself a fellow law

enforcement insider as a former Ohio State Highway Patrol dispatcher. Just as the deputies in Section IV were never held accountable for misconduct spanning fourteen years, the deputies in Plaintiff's case acted with the institutional assurance that covering for fellow insiders and criminalizing victims would carry no consequences. (¶¶100–104, ¶¶109–111, ¶115, ¶151, ¶203, ¶¶216–222, ¶369)

507. Where multiple officers all engage in the same affirmative conduct that increases the risk of private violence, this supports a Monell claim against the county based on a custom of constitutional violations. Here, Section IV document that deputies in the Lawrence County Sheriff's Office repeatedly suppressed evidence, fabricated reports, and protected insiders across a fourteen-year period involving at least nine separate incidents, seven federal lawsuits, and a federal indictment — and that the same deputies reappeared in successive incidents. This is not isolated misconduct. It is a deeply embedded institutional custom that directly caused the deputies to take the affirmative act that created the state-created danger to Plaintiff. (¶¶203–222)

508. These customs were the moving force behind the state-created danger because they predictably caused Corporal Pizelli to (i) treat Plaintiff's evidence and safety as expendable and (ii) use official documentation and court-facing submissions to shield Corbin and restrict Plaintiff's documentation. (¶¶86–87, ¶¶105–111, ¶115, ¶159, ¶¶210–222)

**The Cumulative Effect: Reversal of Protection**

509. Before March 15, 2024, Plaintiff possessed an active Civil Stalking Protection Order against Corbin — a legal framework that recognized Corbin as a danger to Plaintiff and restrained him from contact. Through the affirmative act of Lawrence County deputies, this protection was not merely eliminated but reversed: the protection order framework was turned against Plaintiff so that Corbin became the protected party and Plaintiff was prohibited from recording him. Plaintiff was left legally prohibited from documenting the conduct of the man who had threatened to kill her. (¶34, ¶¶48–49, ¶¶110–111, ¶115, ¶151)

510. This is the precise injury that the state-created danger doctrine exists to remedy: state actors who affirmatively place a particular plaintiff in a position of danger the plaintiff would not otherwise have faced. Before Corporal Pizelli's intervention, Plaintiff was legally protected. After Corporal Pizelli's affirmative act, she was legally silenced — while the man who had threatened to kill her was shielded by the very legal system that was supposed to protect her. (¶34, ¶¶48–49, ¶¶110–111, ¶115, ¶151)

511. Causation. Lawrence County's customs documented in Counts 16–18 and in Section IV were the moving force behind the deputies' affirmative act that created the state-created danger. But for the deeply embedded institutional customs of suppressing evidence, fabricating documentation, and protecting insiders, the deputies would not have suppressed Plaintiff's felony threat evidence, would not have arrested the victim rather

than the aggressor, and would not have solicited the protection order that shielded Corbin and silenced Plaintiff.

512. Damages. As a direct and proximate result of Lawrence County's customs and the deputies' affirmative act, Plaintiff suffered extreme and ongoing fear of private violence from Bobby Corbin; physical vulnerability and inability to protect herself; trauma exacerbation and severe emotional distress; deprivation of liberty; and other compensatory damages. Following the arrest, Corbin repeatedly violated the active protection order by passing Plaintiff's property within the prohibited distance, demonstrating that the danger the deputies created was not hypothetical but ongoing and actual. (¶115, ¶¶117–119, ¶¶138–139, ¶151, ¶191, ¶194)

## VI. INJURIES / DAMAGES

As a direct and proximate result of the conduct alleged herein, Plaintiff has suffered and continues to suffer the following injuries and damages:

513. Deprivation of liberty, including nine (9) hours of custodial detention without legal process, mandatory pretrial restrictions, and forced displacement from her residence for the duration of the criminal proceedings.

514. Loss of employment at Microsoft and career damage, directly resulting from the cascade of instability caused by the arrest and prosecution.

515. Forced sale of Plaintiff's 3,000-square-foot, 31-acre Ohio home with pool and finished basement, and relocation to a 1,500-square-foot home on 28 acres in Kentucky with significantly reduced amenities.

516. Loss of Plaintiff's 2.8% mortgage interest rate, replaced by a 5.7% rate on the Kentucky property.

517. Between $40,000 and $50,000 in credit card debt incurred as a direct result of the financial devastation following the arrest, prosecution, and job loss.

518. Mortgage delinquency placing Plaintiff's Kentucky home at risk of foreclosure.

519. Out-of-pocket expenses including legal defense costs, forced relocation costs, real estate agent fees, Airbnb apartment rentals required by the Prosecutor's Office, storage rentals, and cab fares necessitated by the inability to safely travel during daylight hours.

520. Severe exacerbation of pre-existing PTSD and depression, resulting in generalized anxiety disorder, insomnia, trauma-related distress, flashbacks, and a documented fear of police.

521. Sustained terror for Plaintiff's physical safety, including genuine fear that she would be murdered by the individuals her aggressors were connected to, and begging Deputy Frame not to murder her during transport.

522. Approximately three and a half months of escalating stalking, harassment, and nighttime intimidation by emboldened private actors, rendering Plaintiff effectively imprisoned on her own property.

523. A life-threatening confrontation on Plaintiff's final day at the residence, in which Cindy Isgett attempted to interpose her vehicle between Plaintiff and the moving truck.

524. Reputational harm arising from the arrest, criminal charges, and prosecution.

525. Invasion of digital privacy through the warrantless search and access of Plaintiff's cellular phone.

526. Loss and destruction of exculpatory digital evidence, including missing security camera recordings from the date of arrest that were present before the phone was seized.

527. Profound distrust of the justice system and severe institutional trauma.

528. Documented fear of neighbors and serious social anxiety specifically directed toward Plaintiff's current neighbors.

529. The need to petition for Social Security Disability as a direct consequence of the physical and psychological injuries sustained.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Marina Drus respectfully requests that this Court enter judgment in her favor and against Defendants, and award the following relief:

Plaintiff seeks compensatory damages in an amount to be determined at trial, including but not limited to damages for deprivation of liberty; destruction of Plaintiff's livelihood and career, including loss of employment and resulting loss of income and earning capacity; financial losses associated with forced relocation; loss in value from the pressured sale of Plaintiff's Ohio residence after substantial renovations; increased mortgage costs and loss of a favorable interest rate; downgrade in housing size, quality, and amenities following relocation; legal expenses and defense costs; relocation, storage, transportation, and security-related expenses; substantial credit card debt and other financial losses; reputational harm; emotional distress and severe psychological trauma; and exacerbation of pre-existing PTSD and depression, as well as the onset of severe institutional trauma, Generalized Anxiety Disorder (GAD), chronic insomnia, and other ongoing trauma-related conditions.

Punitive damages against each individual Defendant in an amount sufficient to punish and deter future constitutional violations;

Declaratory judgment that Defendants' conduct as alleged herein violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and 42 U.S.C. § 1985(3);

Injunctive relief as the Court deems just and proper to prevent future violations;

Reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988;

Pre-judgment and post-judgment interest as allowed by law;

Such other and further relief as the Court deems just and proper.

## VIII. JURY DEMAND

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,

s/ Marina Drus

Marina Drus, Pro Se
15616 Silver Run Rd
Catlettsburg, KY
917-805-2615
marina.drus@gmail.com

Dated: _____03/11/26__________